Madden, Judge,
delivered the opinion of the court:
The plaintiffs, in their tax year 1954, received certain profits. They were required to pay income taxes upon these profits on the basis that they were ordinary income. They contend that the profits were capital gains, and taxable only as such.
Ida Goldenberg, a widow, and her son Sol developed a prosperous business in Los Angeles, California. They manufactured and sold tread rubber for the retreading of tires, and materials for the repair of tires. They also distributed new tires, under a franchise from the B. F. Goodrich Company. Their market area was southern and central California. Beginning in 1944 the business was carried *428 on as a partnership. In 1946 it was transferred to a corporation in which the two former partners were the only stockholders. In 1948 another partnership was formed by Sol, Ida and Jerome Goldenberg, Jerome being another son of Ida. The partnership made an agreement with the corporation which had been formed in 1946, that the partnership would purchase and market the products manufactured by the corporation.
Some time prior to November 1, 1951, a representative of Loyola University Foundation entered into negotiations with the Goldenbergs to buy the assets of the corporation and the partnership. The Foundation was a California corporation which, in 1946, had been determined to be exempt from Federal income taxes as an educational and charitable organization. In 1952 its name was changed to University Hill Foundation.
Representatives of the Foundation made a thorough examination of the plant, books, balance sheets and operating statements of the Goldenberg properties. They first offered $1,600,000, then $1,800,000 and finally $2,000,000, plus the book value of the assets. There was negotiation over the amount of the down payment, and the period of years within which the purchase price should be paid. The Goldenbergs prevailed as to the down payment, which was fixed at $100,000 and the Foundation prevailed as to the time of payment, which was set at 10 years. The Foundation requested Sol Goldenberg to manage the business for five years. He agreed to do so for three years.
The transaction was consummated as of November 1,1951, by the transfer by the Goldenbergs to the Foundation of all of the stock of the corporation and all of the assets of the partnership, for $2,000,000, plus the book value of assets of the corporation and the partnership, plus $50,000 for the real estate on which the business was conducted. The Foundation paid $100,000 down and assumed and agreed to pay all the existing obligations and liabilities of the corporation and the partnership as reflected by a certified audit by the Gold-enbergs’ accountants. The Foundation agreed to pay the balance of the purchase price by paying to the Goldenbergs 90 percent of all rents which it would receive from a lessee to *429 which the Foundation, would lease the business for operation, except that the Foundation could retain the first $95,000 of such rents.
The 90 percent of the rents were to be paid to the Golden-bergs until the full purchase price was paid. The Foundation was not obligated to pay the purchase price except out of the rents, and there was to be no interest for ten years, but if the full purchase price had not been paid at the end of ten years, the balance was to be then due and payable, and was to bear 4 percent interest from that time. Upon default of the Foundation’s obligation, the Goldenbergs could at their option, declare the entire purchase price due and payable, whereupon the trade name of the business would revert to the sellers. The Foundation gave to the Goldenbergs a mortgage upon the real estate and a chattel mortgage upon the personalty.
The lessee operating company to which the Foundation leased the facilities of the business was a corporation, formed for the purpose, of which corporation Sol Goldenberg was president. Its lease from the Foundation was for five years. It was to pay the Foundation as rent 80 percent of the net profits of the operation of the business. During the period of the lease, a majority of the stock of the lessee corporation was to be in the hands of persons approved by the Foundation. There were, of course, many other provisions for the details of a sizable and complicated business transaction. They are recited in our findings.
The Government claims that what was labeled as a sale was so labeled only for the purpose of making the proceeds of the transaction appear to be capital gains, thus making them eligible for the reduced income tax rate on such gains. It says that the transaction was in fact a continuation by the Goldenbergs of the operation of their business, and that their receipts were ordinary income, taxable as such.
There has been much evidence and argument about whether the business was worth the price which the Foundation agreed to pay for it. The Foundation had acquired a large number of going enterprises. It had been dealing in a rising market. Its earnings had been tax exempt, under a 1946 determination by the tax authorities. If it could *430 acquire a profitable and growing business with a relatively small down payment and initial liability for the current obligations of the business, and commit itself only to devote the earnings of the business to the payment of the purchase price, it could afford to agree to a higher price than would be prudent for a normal purchaser which obligated itself at all events to pay the agreed price. From the Foundation’s standpoint, the transaction was highly speculative because of the price it agreed to pay, but it had so little of its own money at stake that its losses would be tolerable if the speculation proved unsuccessful. In fact it turned out to be highly successful. In spite of the fact that the Foundation’s tax exemption was revoked at about the same time that it made this purchase, it will in 1961, at the end of the ten years in which it had to pay for the property, be the owner of a large and profitable business, paid for out of the profits of the business. Whether it has also paid its taxes out of those profits, or out of other funds, we do not know.
The fact that a purchaser of an asset pays more for it than it is worth does not, of itself, convert the sale into something other than a sale, for tax purposes. It may, at the most, suggest to a diligent tax collector that the transaction may have other features which belie its appearance. When, however, the tax collector has searched for those other features and has not found them, he must be content with collecting his capital gains tax.
From the standpoint of the Goldenbergs, they were, before the 1951 transaction, the owners of valuable properties and a valuable going business. The Government takes no exception to the trial commissioner’s finding that the fair value of these assets to the normal taxpaying investor would have been $1,174,006.23. After the 1951 transaction the Goldenbergs had no interest in these assets except a security interest, the power to take them back in case of default in payment for them. If they increased in value because of general prosperity or business success, or in dollar value because of inflation, the Goldenbergs would get no part of that important incident of ownership. If the Foundation had defaulted and the Goldenbergs had got their property *431 back, and bad again operated it and made profits from it, they would of course have had to pay ordinary income tax on those profits. They did not and will not get the property back, and when the final payment is made by the Foundation in 1961, even their security interest in the property will be gone, and they will have no relation whatever to it.
We think it is logically and legally impossible for an owner to part with his property, for a consideration, without selling it. The consideration which he gets for parting with his property is not income from the property, but is the price of his parting with the property.
The plaintiffs are entitled to recover on their claims relating to the transaction with the Foundation.
Sol Goldenberg, one of the plaintiffs in No. 52-59, participated as a partner in some real estate transactions unrelated to the Foundation transaction. These transactions are described in findings 64 through 72. Sol Goldenberg received in 1954 certain profits from these transactions. He treated these profits as capital gains, for income tax purposes. The tax authorities treated them as ordinary income derived from the business of selling real estate, and required him to pay income taxes on that basis. We do not analyze these transactions in detail but state our conclusion that we are not persuaded that the determination of the taxing authorities was erroneous. The plaintiffs in No. 52-59 are not entitled to recover on this part of their claim.
The plaintiffs in each of the three cases are entitled to recover, with interest as provided by law, on their claims relating to the proceeds of the transaction with the Foundation and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Buie 38(c).
It is so ordered.
Duefee, Judge; Laramoke, Judge; Whitakee, Judge; and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
*432 1. These cases were tried together since they involve common issues arising out of the same transactions. The Union Bank of Los Angeles, California, is the duly appointed executor of the estate of Sol Goldenberg, who died subsequent to the trial of these cases.
At all times material to these actions, Sol Goldenberg and wife, Anna Goldenberg, resided in Beverly Hills, California. Jerome Goldenberg (brother of Sol Goldenberg) and wife Helena Goldenberg resided in Los Angeles, California. Ida Goldenberg, the mother of Sol and Jerome Goldenberg, also resided in Los Angeles, California.
2. Prior to 1944, Ida Goldenberg was the sole owner of a business conducted on the real property located at 8228 South Central Avenue in Los Angeles, California. The property, hereinafter referred to as the Central Avenue property, consisted of land and buildings which Ida had inherited from her deceased husband. Her son, Sol, was the general manager of the business.
In January of 1944, Sol and his mother formed a partnership for the operation of the business on the same premises under the name of Golden West Rubber Mills, in which each of them owned a 50-percent interest.
On June 25,1946, the partnership assets and business, with the exception of the real property, were transferred to and acquired by Golden West Rubber Company, a California corporation, of which 50 percent of the stock was owned by Sol Goldenberg and 50 percent by his mother, Ida. As president of the company, Sol received a salary of $20,800 per year, and this continued until November 1, 1951. His mother’s salary during the same period of time was $5,200 per year, and the corporation paid her a rental of $12,000 per year on the Central Avenue property.
3. Shortly after its formation, the corporation began the manufacture and sale to dealers of tread rubber for the retreading of tires and materials for the repair of tires. It also distributed to dealers a popular brand of new tires and tubes, the Diamond brand, which was manufactured by the B. F. Goodrich Co. By contract with the manufacturer, the corporation had an exclusive franchise for the distribution of Diamond tires and tubes in southern California. The *433 primary market area of the corporation was southern and central California, and its major profit was derived from the sale of tread rubber rather than from the distribution of new tires and tubes.
4. After the end of World War II, there was a great demand for new tires and tubes and virtually none for retreading of tires because of restrictions on the manufacture and sale of new tires during the war and the consequent exhaustion of retrea&able tires.
5. In 1947 the corporation made several changes which resulted in a substantial increase in its business. These changes included the following:
(a) The organization and training of a larger sales force;
(b) the establishment of a technical department;
(c) improvements in the quality of the product by the use of new and better materials, including a carbon-black known as “Phil-Black-O”, and the procurement of equipment specially designed for making the retreading and tire repairing materials;
(d) road testing tires retreaded with its product, and
(e) the inauguration of a special program for assisting its dealers in merchandising and applying the product.
6. The corporation pioneered these important developments in the industry and thereby gained a substantial time lead over its competitors, including the major rubber companies. Although the corporation did not have an exclusive franchise on “Phil-Black-O”, it had the equipment to process this material and was the first to use it in the making of retreading rubber in California. The corporation did not have any patented processes but it developed several secret but unpatentable processes which were useful in the business. Although it was engaged in a highly competitive business against such concerns as the Goodyear Tire and Rubber Co., Firestone Tire and Rubber Co., and others, the corporation acquired a definite advantage over these competitors in southern and central California in the quality of its product, in its service to customers, and in its costs. In the years 1948 and 1949, the corporation incurred considerable costs because of the increased personnel required to develop its new sales and service programs to the fullest extent.
*434 7. On October 26, 1950, Sol, Ida, and Jerome Goldenberg formed a partnership for the purpose of carrying on the tire and rubber sales business under the name of Golden West Tire & Rubber Co. The capital assets of the partnership consisted of $80,000 in cash of which $40,000 was paid by Sol, $32,000 by Ida, and $8,000 by Jerome. The profits and losses were to be shared in proportion to the capital contributions. On the same date, the corporation, Golden West Rubber Co., which was in the process of changing its corporate name to Golden West Rubber Manufacturers, Inc., entered into an agreement for one year with the partnership by which the corporation agreed to sell and the parnership agreed to buy all of the items manufactured by the corporation at prevailing list prices in southern California, less 30 percent. The partnership was organized for three purposes:
(1) To enable Jerome Goldenberg to own a part of the business. He had no funds for the purchase of stock in the corporation, but his mother loaned him the $8,000 used in payment of his contribution to the capital of the partnership;
(2) to set up a sales division and to separate sales from manufacturing operations, and
(3) to reduce income taxes by a division of income between the corporation and the partnership.
As of January 17, 1951, the name of the corporation was changed from Golden West Rubber Co. to Golden West Rubber Manufacturers, Inc.
8. The extent to which Golden West had, by the methods described in preceding findings, increased its business up to the beginning of the Korean War in July 1950 is shown in the following tables:

California percentage of national car registrations at beginning of each year

*435 Golden West percentage -of California tread rubber sales, in poundst up to beginning of Korean War
(Using above percentages of National to determine California sales)

9. The foregoing statistics show that despite a merely nominal rise in the California percentage of motor vehicle registrations from 1947 to July 1950, Golden West’s percentage of tread rubber sales tripled during the same period. In 1950, as well as in 1951, Golden West sold over 20 percent of the tread rubber marketed in California, although its trade territory covered only central and southern California. It had the lion’s share of the business in the market it covered, and no other firm came anywhere near its percentage of sales of tread rubber.
10. Tire retreading is a very important segment of the tire industry, since it is commonly accepted that no successful tire dealer can remain in business without having a retreading department. Although highly competitive, it is a stable rather than a hazardous business. Because of its economic advantages, it is a business which improves during periods of financial depression. The use of tread rubber increased steadily and rapidly from 1935, both in the number of pounds and as a percentage of new tires sold. A slight bulge during the Korean War was surpassed by 1953, and thereafter a rise continued. It is a steadily and rapidly growing industry, and as of November 1, 1951, its natural growth was well in evidence. On March 26, 1951, a firm of security analysts distributed on a subscription basis to brokerage houses a “Rubber Industry Review”, which stated:
Because of the vast improvement in retread tires and the lower costs, it is predicted this division of the industry possesses the greatest growth possibilities.
*436 11. At tlie outbreak of the Korean War in 1950, the Government instituted a program for the allocation of rubber under which the amount obtainable by any manufacturer was based on its consumption during the base period July 1,1949 through June 30,1950. As of November 1,1951, Golden West had an allocation of rubber based on its prior use, as well as established sources of supply for other materials, and it enjoyed the lowest buying prices available at that time. The name “Golden West” was widely recognized in the industry. The business had an established list of customers, as well as a backlog of orders and a steady flow of new orders.
12. On August 24, 1951, Golden West Rubber Manufacturers, Inc., purchased from the Radio Corporation of America a large quantity of additional equipment at a price of $76,590. The equipment had originally been purchased by RCA in 1947 for $250,000, was in excellent condition, but was not being used. RCA had originally acquired the equipment for the mixing of stock for phonograph records in a plant in Hollywood, which was shut down.
Included in the equipment was a Banbury mixer, a machine 11 feet 6 inches wide, 29 feet 6 inches long, 13 feet 11 inches high, and weighing without its motor 32y2 tons. At the time of purchase, it was virtually impossible to obtain such a machine, because it would have required a priority and approximately 3 years to get one from the manufacturer. The mixer was of special value to plaintiffs because at the time plaintiffs’ stock, consisting of carbon-black and other materials, was being mixed by another concern. The acquisition of the mixer meant that Golden West could mix materials at a lower cost, control the quality of the mix, produce the material without delay, and provide better service to customers. Under these circumstances, the value of the equipment to the business in which the corporation was engaged was considerably greater than the cost of the equipment.
13. As of October 31,1951, the mixer and other equipment acquired from ROA had not been put into service because a larger plant site than the Central Avenue property was needed. The corporation had funds available for acquiring *437 a larger site and, at the time stated, was looking for the type of property needed. Under the sale agreement with BCA, a period of 6 months was allowed for the removal of the equipment.

Transactions With University Hill Fovmdation

14. Sometime prior to November 1, 1951, L. M. Malone, the assistant secretary of Loyola University Foundation, entered into negotiations with Sol Goldenberg to acquire on behalf of the Foundation the assets of the corporation, Golden West Bubber Manufacturers, Inc., and of the partnership doing business under the name of Golden West Tire & Bubber Co. The Loyola University Foundation was a California corporation which, on November 19, 1946, was held to be exempt from Federal income taxes as an educational and charitable organization. In 1952 its name was changed to University Hill Foundation, and it is hereinafter referred to as the “Foundation.”
Bepresentatives of the Foundation made a complete and thorough examination of the Golden West equipment at the Central Avenue property, as well as the equipment that had been recently acquired from BCA and was then located at its Hollywood plant. The books and records of the corporation and the partnership with balance sheets and operating statements were made available to the Foundation. It also had information about the Golden West companies from other sources.
15. The negotiations included a number of meetings. Father Malone visited the plant three or four times and there were meetings in the offices of the attorneys who represented the parties. In the negotiations, the principal disputes were (1) the total price to be paid by the Foundation, (2) the amount of the downpayment, and (3) the period to be allowed for payment in full.
With respect to point (1), the Foundation first offered $1,600,000 plus the book value of the assets, then $1,800,000 plus book value, and then $2,000,000 plus book value, a figure which was acceptable to the Goldenbergs. The Foundation wanted to pay only $10,000 down, whereas the Goldenbergs insisted on a minimum downpayment of $100,000. The *438 Goldenbergs wanted tbe total purchase price to be paid over a 5-year period, but the Foundation held out for a 10-year period. These two disputes were resolved by agreements that the downpayment would be $100,000 and that 10 years would be allowed for payment of the balance.
In addition, the Foundation requested Sol Goldenberg to continue the management of the businesses to be acquired by the Foundation for a period of 5 years. He refused to do so but did agree to stay for a period of 3 years.
16. Although the Goldenbergs were represented by counsel, the general plan of the “Purchase Agreement” was drafted by Paul R. Cote, who was the president of the Foundation and was also its attorney. The agreement was executed November 1, 1951, by the Foundation as Buyer, and by Sol and Ida Goldenberg, and by the Golden West Tire & Rubber Co., through its three copartners as Sellers. The Purchase Agreement, in evidence as plaintiffs’ exhibit 36, provided in substance as follows:
(A) As of November 1,1951, Sellers sold and transferred to the Buyer all of the outstanding stock of Golden West Rubber Manufacturers, Inc., all the assets of Golden West Tire & Rubber Co., a partnership, and the Central Avenue property at a minimum purchase price of $2,000,000, plus a sum equal to the net book value of the corporation and the partnership, plus $50,000 for the real property. The Buyer was to make a cash downpayment of $100,000, and the balance of the purchase price was to be payable in the following manner:
(1) The Buyer agreed to liquidate and dissolve the corporation upon the delivery of the shares of stock. The assets were to be distributed to the Buyer. It was also agreed that the transfer of the assets of the partnership to the Buyer should constitute a termination of the partnership and that upon the liquidation of the corporation and partnership, the Buyer assumed and agreed to pay all of the existing obligations and liabilities of the corporation and the partnership as reflected by a certified audit of the books and records to be prepared by Sellers’ accountants, David Belinkoff & Co., as of October 31, 1950.
*439 (2) Concurrently with the liquidation of the corporation and partnership, the Buyer agreed to execute a lease to a company selected by it to operate the businesses formerly conducted by the partnership and corporation and to let to the lessee the name, goodwill, secret processes and formulae, real property, and all fixed assets received by the Buyer from the liquidation of the corporation and partnership.
(3) The Buyer further agreed to sell to the lessee company all of the assets received from the liquidation of the corporation and partnership, except cash of $150,000, the fixed assets, the names, the goodwill, and the secret processes and formulae in consideration of the lessee’s written agreement to assume and pay the current and deferred expenses, obligations, and liabilities of the corporation and partnership as shown by the audit of October 31,1951, and to pay the Buyer the amount by which the assets transferred to the lessee exceeded the total liabilities and obligations assmned, such payment to be evidenced by lessee’s promissory note due 2 years after November 1,1951, without interest. The Buyer agreed to hold the $150,000 in cash in trust for the purpose of acquiring additional real property to be leased to the lessee company in connection with the businesses.
(4) The Buyer agreed to pay to the Sellers to apply on the purchase price 90 percent of all rents in excess of $95,000 received by the Buyer from the lessee company or other lessee until the balance of the purchase price was paid in full.
(B) If not sooner paid, the entire balance of the purchase price was to be due and payable on October 31,1961, without interest prior to that date but to bear interest at the rate of 4 percent per annum thereafter.
(C) All payments made by the Buyer were to be made to Sol Goldenberg, acting in his own behalf and as trustee for Ida and Jerome Goldenberg.
(D) The Buyer was obligated to pay the balance of the purchase price only out of the rental received from the lessee company or other lessee.
(E) In the event that the corporation, partnership, the Buyer, or the lessee company should be required to use the profits from the business or the rentals to pay any liabilities *440 or obligations of the partnership or corporation, they were entitled to do so, but any amount so used would not be applied to the purchase price nor would such use of the profits or rents be considered a default of Buyer’s obligations to Sellers.
(F) Seller’s acceptance of any notes given by the lessee company or companies for the purchase price of the assets sold to the lessee was not to be considered as payment by the Buyer until the notes were paid in cash, but the Buyer agreed to assign such note or notes to the Sellers as additional security for the purchase price.
(G) Upon default of the Buyer’s obligation, Sellers were given the option to declare the entire purchase price immediately due .and payable and, in such event, the exclusive right to use the name “Golden West” or any combination thereof would automatically revert to the Sellers.
(H) Concurrently with the execution of the Purchase Agreement, the Buyer agreed to execute and deliver to Sol Goldenberg as trustee for the Sellers, a deed of trust upon the real property and a chattel mortgage upon the personal property acquired by the Buyer; the Buyer also agreed to execute trust deeds upon any real property and chattel mortgages upon any personal property acquired by the Buyer at any time as a result of the transaction or through the provisions of the lease or leases.
(I) The rental to be paid by the lessee company was to be based on its net profits, which were defined as net profits before any deduction for income, franchise, or other similar taxes.
(J) The Buyer agreed to keep records reflecting all rental received from the lessee and all proceeds from the sale of any assets received by the Buyer until the full amount of the purchase price was paid and to make such records available for inspection by the Sellers.
(K) Sol Goldenberg agreed that for a period of 3 years from November 1, 1951, or until the Purchase Agreement was declared to be in default, he would not enter into any business venture which would compete with the business then being conducted by the lessee company.
(L) The Sellers agreed to indemnify the Buyer against any taxes, assessments, penalties, interest or liabilities of any *441 kind that would be levied against or found to be due by the corporation or partnership, except as were set forth in the certified audit prepared by David Belinkoff & Co., as of October 31, 1951, and attached to the Purchase Agreement.
17. The Purchase Agreement was carried out in accordance with its terms. By December 13, 1951, the corporation was liquidated and all of its assets were transferred to the Foundation which executed an agreement assuming and guaranteeing to pay all of the obligations of the corporation. As of November 1, 1951, the partnership was dissolved and ceased to do business under the name of Golden West Tire & Rubber Co. The cash payment of $100,000 was made by the Foundation to the trustee on December 17,1951.
18. On November 7, 1951, pursuant to the terms of the Purchase Agreement, a written lease agreement was entered into as of November 1, 1951, between the Foundation and Golden West Rubber Products, Inc., a newly organized California corporation of which Sol Goldenberg was president and Jack Helfend was secretary. Under the terms of the lease agreement, Golden West Rubber Products, Inc. (hereinafter referred to as the first lessee) was to operate the business acquired by the Foundation under the Purchase Agreement. The leased property consisted of the Central Avenue property and other fixed assets obtained by the Foundation under the Purchase Agreement, plus the name and goodwill of “Golden West” and the secret processes and formulae also acquired by the Foundation in the Purchase Agreement. The lease was for a term of 5 years ending October 31, 1956. The lease agreement is in evidence as plaintiffs’ exhibit 37 and stated in substance that:
(A) As rental the lessee agreed to pay 80 percent of the net profits resulting from its use of the demised premises and the operation of the business conducted thereon.
(B) The lessee’s net profits were to be computed at the end of each quarter and the rental based thereon was to be paid before the fortieth day following the close of each quarter, provided that if the operations of the lessee resulted in a loss in any quarter, the loss was to be absorbed by the profits from any other quarter occurring during the same annual period.
*442 (C) The lessor was not to be called upon to expend anything for maintenance or repair of the demised premises or personal property.
(D) Lessee was to maintain the premises in a good state of repair and was given the right at its discretion to alter, add to, or repair the leased premises with the understanding that if the alterations, additions, improvements, or repairs were subject to capitalization under regulations of the Internal Bevenue Service, the cost thereof was to be capitalized and credited upon the next installment of rent due the lessor, but if not subject to capitalization, the costs were to be charged as an expense in the operation of lessee’s business. Lessee was not authorized to expend more than $2,500 per quarter for such alterations, additions, improvements, or repairs without the written consent of the lessor.
(E) Lessee was to pay all general property taxes assessed against the premises and to keep them free of all mechanics’ and other liens.
(F) The lease was not to be assigned or the leased property sublet without the written consent of the lessor.
(Gr) For default by lessee of the provisions of the lease, except a default in the payment of rental, the lease was subject to termination by the lessor after giving 30 days’ notice. This applied also to a default in the payment of rental except that the notice period was 10 days.
(H) Upon termination of the lease, the name and goodwill let to the lessee were to revert to the lessor.
(I) At all times during continuance of the lease, the majority of the outstanding capital stock of the lessee, together with voting rights appurtenant thereto, was to be held only by such persons as were approved in writing by the lessor.
19. Under the terms of the Purchase Agreement, the purchase price totaled the net sum of $2,720,299.13 after a deduction for the liabilities assumed by the Foundation. An undisclosed liability of $107.65 was later discovered and then applied against the purchase price.
20. Pursuant to the Purchase Agreement, the Foundation executed a bill of sale and assignment under date of November 7, 1951, by which it sold and assigned to the first lessee *443 all of the assets obtained by the Foundation on the liquidation of the corporation and the partnership, except the assets leased to the first lessee. Included in the assets sold to the first lessee was cash in the amount of $286,647.13, less $150,000 to be deposited in trust for the acquisition of additional real estate, or the net amount of $136,647.13. Other assets sold were accounts and trade acceptances receivable totaling $268,119.44, merchandise inventory of $169,900.70, a deposit of $10,000 on future purchases, autos and trucks valued at $9,657.41, and minor items totaling $2,804.13. The total assets sold to the first lessee amounted to $597,129.81. In the bill of sale, the first lessee assumed and agreed to pay the liabilities which had been assumed by the Foundation in the Purchase Agreement and which totaled $178,399.24. The excess of the value of the assets sold over the total liabilities assumed by the first lessee was the sum of $418,729.57. The first lessee executed a note payable to the Foundation on or before 2 years after date for this amount, without interest. The Foundation then assigned the note, without recourse on it, to Sol Goldenberg, trustee, as security for payment of the purchase price by the Foundation.
21. As previously stated, $150,000 of the cash assets acquired by the Foundation under the Purchase Agreement was to be held in trust to acquire additional real estate to be leased to the first lessee in connection with the business to be operated thereon. As of February 25,1952, the Foundation executed escrow instructions by which it agreed to purchase the additional real estate for a consideration of $185,000, subject to an improvement bond of $4,814.18 and interest thereon. The Foundation received title to the property and paid the $185,000, plus escrow and other costs amounting to $728.75. Subsequently, the Foundation also paid the bond and interest so that the amount expended for the real estate totaled $190,629.73. The excess of $40,629.73 over the $150,000 set aside for the purchase was paid by the Foundation out of its general funds. The real estate acquired was located at 2925 Fruitland Avenue, Vernon, California, and is hereinafter referred to as the Fruitland Avenue property.
22. In accordance with the Purchase Agreement, the Foundation gave Sol Goldenberg, trustee, a trust deed on *444 the Central Avenue property, a chattel mortgage on the machinery and equipment acquired on liquidation of the corporation, and on April 29, 1952, a trust deed on the Fruitland Avenue property. The Foundation did not give the trustee its note for the balance of the purchase price due after the downpayment. Thus, if 90 percent of rentals received from the lessees was not sufficient to pay the balance due the trustee by October 31, 1961, the right of the trustee to enforce payment of the balance was limited to the trust deeds, chattel mortgage and other collateral given as security for payment of the purchase price.
23. In November 1951 pursuant to the provisions of the first lease, the Foundation approved Sol Goldenberg, Jeróme Goldenberg, Jack Helfend, and David Belinkoff as the holders of the majority of the stock of the first lessee but limited the holdings of Sol and Jerome Goldenberg to a maximum of 48 percent of such stock.
24. The capital stock of the first lessee company was issued December 12, 1951, for cash, at $10 per share, as follows:

Mr. Helfend had been employed by Golden West Rubber Manufacturers, Inc., for many years prior to the Purchase Agreement. After the execution of the lease, he became secretary of the first lessee and was its office manager with responsibility for handling credits and collections. He also, did some selling.
Fran Beiter had been plant manager of Golden West Rubber Manufacturers, Inc., prior to November 1, 1951. When the first lessee took over the operation of the business, he became plant manager in charge of production. Mr. Beiter disposed of all of his stock, selling 40 shares to the lessee corporation, 10 shares to John C. Johnson, and 10 shares to Jack Helfend.
*445 David Belinkoff is a certified public accountant and the head of an accounting firm which had performed auditing and accounting services for Sol Goldenberg for many years. He purchased the stock in the first lessee at his own request, because he considered it an excellent investment. He disposed of half of the stock, leaving himself a balance of 100 shares.
Mildred Spencer was a nominee of the Foundation.
25. As of the date the Purchase Agreement was signed, the corporation and partnership had eight officers and heads of departments, five men in its sales department, and twenty-four other employees. This entire force was taken over by the first lessee. John C. Johnson, who had been employed as sales manager by the corporation in 1948 but who left the organization before November 1, 1951, was reemployed late in 1951 to serve again as sales manager of the first lessee.
26. Sol Goldenberg was president of the first lessee from November 1,1951 to October 31, 1956, and was paid a salary of $20,000 per year. He had responsibility for hiring personnel, dealing with customers, and purchasing plant equipment. On January 28, 1955, he executed a continuing guarantee in behalf of the first lessee to its bank. The guarantee was limited to $100,000 and remained in effect until October 31,1956.
27. The first lessee made rental payments to the Foundation in the amount of $50,000 on March 3, 1952, and in the amount of $150,000 on July 2,1952. After October 31,1952, the first lessee paid the Foundation the sum of $59,599.22, representing the balance due for that fiscal year. The balance paid was arrived at by deducting from accrued rental the undisclosed liability of $107.65 and also the sum of $60,354.68, • which was expended by the first lessee on the Foundation’s behalf for construction and the purchase and installation of machinery and equipment. The lease provided that expenditures for such purposes were to be capitalized and credited against the rent.
28. Prior to the receipt of the first rental payment of $50,000 from the first lessee, the Foundation had made payments and incurred liabilities under the Purchase Agreement as follows:
*446 Downpayment_$100,000. 00
Liabilities of tbe corporation and partnership assumed— 178,399. 24
Downpayment in escrow to buy Fruitland Avenue property, balance of agreed purchase price $185,000 in excess of trust fund of $150,000- 35, 000. 00
29. Under the terms of the purchase contract, the Foundation was not obligated to pay Sol Goldenberg, trustee, any part of the first $95,000 rent received from the first lessee. After the first lessee had made rental payments totaling $200,000, the Foundation paid the trustee $85,000 in cash on July 10,1952. On February 9,1953, the Foundation paid to trustee $59,599.22, the amount received from the first lessee as the balance of the accrued rental due for the fiscal year 1952. On February 13, 1953, the Foundation paid the trustee $28,000. In addition and as stated in finding 21, the Foundation paid a bond assessment, plus interest, of $4,986.42 on the Fruitland Avenue property. On February 4, 1953, the Foundation paid the trustee $771, representing the proceeds from the sale of a piece of equipment by the first lessee.
30. Prior to February 9, 1953, a dispute arose between the Foundation and the Goldenbergs over the latter’s contention that the Purchase Agreement required the Foundation to pay the trustee 90 percent of the cost of capital additions and improvements made by the lessee and credited against rent, as well as 90 percent of cash rent paid by the first lessee. By written agreement of February 11,1953, the Foundation acceded to the contention of the Goldenbergs and as a result made the payment of February 13,1953.
31. As of October 31,1956, when its lease with the Foundation terminated, the first lessee surrendered the premises and other leased assets to the Foundation, which thereupon leased the same property on substantially the same terms to The Camelback Corporation, a California corporation which was organized October 8, 1956, and is hereinafter referred to as the second lessee. By written agreement of October 31,1956, the first lessee sold all of its assets to the second lessee at a price to be determined by deducting liabilities from net worth. The assets so sold totaled $687,401.80, including accounts and trade acceptances receivable at $385,697, merchandise inventory at $286,683.43, advances to employees of *447 $5,711.98, office equipment at $3,172, trucks at $4,004, and prepaid insurance at $1,731.45. The second lessee also assumed and agreed to pay liabilities aggregating $463,040.11, which included a balance of $350,000 then owing on the note of $418,729.57 given by the first lessee to the Foundation and assigned by it to Sol Goldenberg, trustee. The difference between the assets and liabilities amounting to $224,361.69, plus interest of $1,941.89 after October 31,1956, was paid by the second lessee to the first lessee as follows:
October 31, 1956_$40, 000. 00
January 14, 1957_ 10, 000.00
January 16, 1957_ 176, 303. 58
32. In the sale agreement between Golden West Bubber Products, Inc., and the Camelback Corporation, the latter agreed to obtain a release and cancellation of the $350,000 note due by the first lessee and to execute a note for the same amount to the Foundation. On November 1, 1956, the Foundation wrote the attorneys for the first lessee, acknowledging receipt of a note of $350,000 dated November 1,1956, signed by the .Camelback Corporation and payable to the Foundation.
On the same date, the Foundation endorsed the note payable to the order of Sol Goldenberg, trustee, without recourse, and sent it to him with a letter reading as follows:
In reference to your letter of October 25, 1956, in which you enclosed the note of Golden West Bubber Products, Inc. in the sum of $350,000.00, please be advised that we are now in a position to comply with your instructions and enclose herewith a note in the sum of $350,000.00 dated November 1, 1956, executed by The Camelback Corporation. You are to hold the enclosed note as security for the indebtedness of this Foundation to you under its purchase agreement dated November 1, 1951.
The enclosed note is endorsed without recourse to you as trustee.
Through the transactions described above, Sol Golden-berg, as trustee, accepted the note of the second lessee in substitution of that of the first lessee and also consented to the subordination of the payment of the indebtedness evidenced by the note to the payment of any indebtedness owed by the *448 Camelback Corporation to the Union Bank and Trust Company of Los Angeles.
33.Prior to October 31, 1956, when its assets were sold to the second lessee, the first lessee had paid ordinary dividends as follows:
February 1955_$4, 800 ($5. 00 per share)
February 1956_ 6, 720 ( 7.00 per share)
$11,520 $12.
34.After the expiration of its lease and after the sale of the assets to the second lessee, the first lessee was liquidated and liquidating dividends were paid in cash beginning January 21,1957, as follows:

35.The capital stock of the second lessee company was issued October 26, 1956, for cash, as follows:

36.Although most of the personnel of the first lessee remained in the employ of the second lessee, there were several changes in management. John C. Johnson, who had been sales manager of the first lessee, became president of the Camelback Corporation at a salary of $12,000 per year which was increased by 1959 to $15,000 per year.
Sol Goldenberg was neither a stockholder nor an officer of the second lessee but was employed under a contract to serve *449 it on less than a full-time basis. Under the agreement, which expired on October 31, 1959, he handled contracts of long duration with large suppliers, conducted negotiations with union officials, and gave advice to the management when he was consulted. For these services he received a salary of $26,000 per year.
37. Of the assets which the second lessee acquired from the first lessee as of October 31,1956, the amount at which the accounts and trade acceptances receivable were valued fairly reflected the values of those assets at that time; the figure for inventory represented the then fair market value of the inventory, and the figure for the trucks represented the appraised value thereof.
38. As of April 30, 1959, the assets and liabilities of the second lessee company were as follows:
Accounts and trade acceptances receivable (after deducting reserve for bad debts of $51,381.14)_ $654, 841. 57
Merchandise inventory_ 341, 318.48
Other assets_ 41, 812. 51
Total_ 1,037, 972. 56
Current liabilities and reserve for taxes- $535, 675. 08
Note payable to Foundation_ 350, 000. 00
- $885, 675. 08
Net worth, consisting of stock outstanding of $50,000 and accumulated earnings of $102,297.48_ 152, 297.48
The figure of $654,841.57 conservatively reflected the value of the accounts receivable at that time, and the figure of $341,-318.48 reflected the then value of the inventory, at cost or market, whichever was lower.
39.All payments made by the Foundation pursuant to the Purchase Agreement were made to Sol Goldenberg as trustee. Sol, Ida, and Jerome Goldenberg agreed that such payments were to be divided among themselves as follows:

The stock transferred to the Foundation under the Purchase Agreement was acquired in 1946, the partnership interest *450 transferred was acquired on October 26,1950, and tbe Central Avenue property was acquired by Ida Goldenberg prior to 1947. Tbe cost to plaintiffs of the stock and partnership interests as of the date of the Purchase Agreement was as follows:
Sol Goldenberg_$156, 460.26
Ida Goldenberg_ 130,168.20
Jerome Goldenberg_ 26,292. 05
After deducting accumulated depreciation, the cost to Ida Goldenberg of the Central Avenue property as of the date of sale was $15,100.52.
40. On October 1, 1956, the Foundation was in arrears to the trustee on amounts due under the Purchase Agreement to the extent of $116,770.57. On that date the Foundation executed and delivered to Sol Goldenberg, as trustee, a note for the past-due amount, bearing interest at the rate of 5 percent per annum and due on or before September 1,1961.
41. By April 30, 1959, the Foundation had received from the first and second lessees for rental due under the lease contract, the sum of $1,898,182.67, consisting of (a) an undisclosed liability of $107.65, cash in the amount of $1,612,247.16 and (b) $282,827.86 capital expenditures made by the lessees for the Foundation’s account and credited against rental due.
42. The total purchase price of $2,720,299.13 payable by the Foundation under the terms of the Purchase Agreement was reduced to $2,720,191.48 by the undisclosed liability of $107.65. Up to and including July 15, 1959, the Foundation had made payments to Sol Goldenberg, trustee, in the total amount of $1,827,769.24, leaving a balance of $892,422.24 as of that date. The payments consisted of the following:
Downpayment_ $100, 000.00
Payments computed on tbe basis of rentals received_ 1,498,284.45
Payment representing partial payment received by Foundation from first lessee company on note of $418,729.57 field by tbe trustee as security- 68, 729.57
Payments representing proceeds received by tbe Foundation from sales of assets: Equipment_ 14,190.45
Central Avenue property (casfi of $3,794.20 and trust deed of $26,000, accepted at face value)— 29, 794.20
*451 A note dated October 1, 1956, constituting a personal obligation of tbe Foundation, and representing arrear-ages of payments due on tbe basis of rentals received- 116, 770.57
1,827, 769.24
43. Up to and including April 1,1959, the Foundation had paid to the trustee a total of $14,596.34 interest on the note of $116,770.57. Although the Foundation was not obligated to pay interest on the unpaid balance of the purchase price, it was required to pay interest on the note given for arrears in payment of the purchase price.
44. Up to July 15, 1959, the Foundation had paid out under the Purchase Agreement $1,653,510.52, consisting of $1,598,284.45 paid pursuant to the Purchase Agreement, excess cash of $40,629.73 paid on the Fruitland Avenue property, and $14,596.34 interest paid on the personal liability note. Excluding the $285,827.86 in capital assets acquired by the Foundation through expenditures made by the lessees in its behalf and credited as rent, the Foundation had by July 15,1959, paid out in cash $41,263.36 more than the total cash rental it had received from the lessees.
45. A short time prior to the trial, it was ascertained that the payments due by the Foundation to the trustee on the basis of rentals received by the Foundation up to and including July 15, 1959, should have been $7,809.38 more than was shown to be due in previous computations. The additional liability was computed as follows:
Rentals received by tbe Foundation both in casb and in property additions, for periods up to April 30, 1959_$1, 898,182. 67
Deductions pursuant to purchase agreement_ 95, 000.00
Balance_ 1, 803,182. 67
90% thereof_ 1,622,864.40
Payments computed on the basis of rentals, as shown above: Cash_$1,498, 284.46
Personal liability note_ 116, 770. 57 1, 615, 055. 02
7, 809.38
46.On or shortly after October 1, 1959, the Foundation paid the principal of the personal liability note in full, to- *452 gather with interest of $2,919.27 thereon from April 1 to October 1,1959. At the same time, the Foundation also paid the deficiency of $7,809.38, plus interest of $1,171.41 thereon.
47. Considering the rate at which the trustee had been receiving payments from the Foundation up to September 1959, and the current operations of the second lessee, there was a reasonable expectation as of September 1959 that the payments to be made by the Foundation on the basis of rentals received from the lessee would amount to about $180,000 for the 6 months ending October 31, 1959, and that the balance of the purchase price would be paid in full on the date due, October 31,1961.
48. The following table shows the net income, the income tax liability, and the net profit, after taxes, of Golden West Rubber Manufacturers, Inc., during the period from July 1, 1946 to October 31, 1951, and also the net income, estimated tax liability, and estimated net profit of the partnership, Golden West Tire & Rubber Co., from October 26, 1950 to October 31, 1951:

*453 49. The greater weight of the evidence establishes that to a normal tax-paying investor, the value of the business acquired by the Foundation as of November 1, 1951, would have been approximately 8 y2 times the annual profits of the business after deducting taxes. There is a conflict in the evidence as to whether the profit for the years 1950 and 1951 should be used for determining the value, as plaintiffs contend, or whether the value should be calculated on the basis of the average annual net profit in the period from July 1946 to October 31, 1951, as defendant contends. The average annual net profit of the business, after taxes, for the 22-month period prior to October 31,1951, was $265,267.32. Therefore, if the base period relied on by plaintiffs is adopted, the value of the corporation and partnership as of October 31, 1951, would have been $2,254,772.30.
On the other hand, if, as defendant urges, the 64-month period preceding November 1,1951, should be used for arriving at the average annual net profit after taxes, the value of the corporation and partnership as of October 31,1951, would have been 8y2 times $114,981.72, or $977,344.62.
50. The years 1950 and 1951 were abnormal in several respects. The earnings of the corporation and partnership during those years were much higher than during any previous period. An unascertainable portion of the earnings was due to the economic conditions that followed the advent of the Korean War in July 1950. Those years were also abnormal in other respects. There was some feeling among businessmen that there might be a second depression in this country, and in the rubber industry there were fears and uncertainty regarding the effect on the industry of the Government’s disposition of the synthetic rubber plants constructed during World War II.
The inclusion of the earnings for 1946 and 1947 in a computation of value would not fairly reflect the value of the business for several reasons. As stated in finding 4, there were few retreadable tires and no demand for retreading materials in the period following the end of World War II. The effects of the new techniques and merchandising practices, which produced a substantial growth in the business *454 and gave Golden West a preeminent position in the industry in California, were not felt prior to 1948.
51. From the record as a whole, it is concluded that in determining the value of the business on November 1,1951, the normal investor would have b,ased the value on the average annual profit for the four years preceding November 1, 1951. The average annual net profit after taxes for the 46 months preceding the date of purchase amounted to $138,-118.38.
In view of the new equipment which had been purchased by the corporation from EGA but not yet put in service, the engineering techniques and sales methods developed by Golden West, its outstanding position in the industry in California, and the growth potential of the business, the fair value of the corporation and partnership considered together as of October 31, 1951, to a normal tax-paying investor would have been 814 times $138,118.38, or $1,174,006.23.
52. The Foundation was not a normal tax-paying investor and purchased the business under the terms of an unusual purchase plan which it drafted. • The Foundation could afford to pay a considerably higher price than the normal investor because of the following:
(1) As an educational and charitable organization, it was exempt from Federal income taxes.
(2) Under the terms of the Purchase Agreement, it acquired a valuable and growing business at an actual risk of only $5,000, since the remaining $95,000 of the $100,000 down-payment was recouped from the earnings of the business through rents paid by the first lessee before the Foundation made any further payments on the purchase price to the Sellers.
(3) The Foundation was obligated to pay the balance of the purchase price only out of the rents received from the lessees which operated the business, and
(4) The Foundation had a period of 10 years in which to pay the balance of the purchase price without any obligation to pay interest prior to October 31, 1961, but it was required to pay interest at the rate of 4 percent per annum on any balance owing thereafter.
*455 Under such circumstances, the purchase price to the Foundation ($2,720,299.13) was not unreasonable or excessive.
53. On or before April 15, 1955, the taxpayers in these three cases filed with the District Director of Internal Revenue at Los Angeles, California, income tax returns showing taxable income and income taxes due for the calendar year 1954, as follows:

The 1954 tax returns of Sol and Anna Goldenberg and of Ida Goldenberg contain stamps showing that on April 15, 1955, the District Director received remittances for the taxes shown to be due on the returns. It is admitted that Jerome and Helena Goldenberg paid the taxes shown to be due on their 1954 return to the collector on April 15, 1955.
The 1954 tax returns were examined by agents of the Internal Eevenue Service who, by reports dated March 13, 1958, determined deficiencies in income taxes as follows:

Amount of Name deficiency

Sol and Anna Goldenberg_$29, 997. 94
Jerome and Helena Goldenberg_ 876. 64
Ida Goldenberg_ 28, 894.77
54. The Commissioner of Internal Eevenue adopted the reports of the revenue agents, and on April 14, 1958, he issued deficiency notices to plaintiffs pursuant to Section 6212(a) of the Internal Eevenue Code of 1954 for the year 1954. Each notice stated:
It is held that you received ordinary income from the continuance of a business as a result of an arrangement with University Hill Foundation in lieu of a long-term capital gain reported by you.
The deficiency notice issued to Sol and Anna Goldenberg contained the following additional determination:
*456 It is held that you received ordinary income in connection with certain joint ventures in lieu of long-term capital gains reported by you.
In each of the deficiencies, there was also a disallowance of medical expenses, which disallowance resulted solely from an increase in the adjusted gross income of the taxpayers by virtue of the other disallowances.
55.On June 13,1958, the taxpayers in each of these cases paid the deficiencies so determined, together with interest thereon, as follows:

The foregoing amounts were assessed May 29,1958.
56. On June 20, 1958, the taxpayers in each case filed claims for refund and stated the grounds therefor as follows:
The Commissioner erred, however, in holding in said notice that claimants “received ordinary income from the continuance of a business as a result of an arrangement with University Hill Foundation in lieu of a long-term capital gain.”
The claim filed by Sol and Anna Goldenberg also added the ground that the Commissioner had erred in holding that the claimants had received ordinary income in connection with certain joint ventures in lieu of long-term capital gains.
The claims for refund filed by taxpayers in each of the three cases also asserted that the Commissioner had erred in disallowing deductions for the medical expenses claimed.
57. On December 8, 1958, Sol and Anna Goldenberg and Ida Goldenberg filed amendments to their claims for refund and added the following grounds:
The purpose of this amendment is to add the ground that the Commissioner erred in failing to hold that the liquidation of Golden West Rubber Manufacturers, Inc., in the year 1951 was a taxable liquidation under sec. 115(c) of the Internal Revenue Code of 1939 and that, as a result, none of the gain of claimants from the sale of their stock in said corporation was taxable in the year involved in this claim.
*457 Claimants also claim refund of any additional amount which, may be refundable because of said additional ground.
58. On February 6,1959, the taxpayers in each of the three cases filed amendments to their claims for refund, asserting that the collection of the deficiencies determined by the Commissioner was barred by the statute of limitations.
59. More than 6 months have expired since the claims for refund were filed and no action has been taken on any of the claims by the defendant.
60. On November 17, 1958, the Commissioner of Internal Revenue issued a deficiency notice to Golden West Rubber Products, Inc., the first lessee, covering the taxable years ended October 31, 1952 to October 31, 1956, inclusive. The deficiencies in income and excess profits taxes asserted in the notice were due in large part to a determination by the Internal Revenue Service that the deductions from the first lessee’s income for rental paid to the Foundation did not constitute proper deductions. Prior to the issuance of the deficiency notice, an Internal Revenue agent had disallowed the first lessee’s deductions for rent paid to the Foundation on the ground that the claimed deductions were merely distributions of the profits of Golden West Rubber Products, Inc., and its predecessor entities. The controversy arising from the issuance of the deficiency notice to the first lessee is now pending in the Tax Court.
61. In a ruling issued April 4, 1956, the Internal Revenue Service revoked the exemption of the Foundation from the payment of income taxes for the fiscal year ended April 30, 1952, and for subsequent fiscal years.
62. On March 25, 1958, the Commissioner of Internal Revenue issued a deficiency notice to the Foundation covering income and excess profits tax liability for the taxable years ended April 30, 1952 to April 30, 1956, inclusive. In the determination of the deficiency, the Internal Revenue Service included as business income to the Foundation the rental it had received from Golden West Rubber Products, Inc., the first lessee, under the written lease of November 7, 1951. The deficiency notice is now pending before the Tax Court.
*458 63. In treating the rent received by the Foundation from the first lessee as income to the Foundation and also as income to plaintiffs in these suits, the Internal Revenue Service took the position that such action was necessary and proper to protect the revenue due the Government.

The Jwmor Estates a/nd Bay wood Parh Ventures

64. On December 4,1951, David Belinkoff and three other individuals entitling themselves the “Southern Group,” entered into a written agreement with S. M. Ludwig and wife, known as the “Northern Group,” for the subdivision into residential lots and the construction and sale of family residences on 784 acres of land in San Mateo, California. The land was known as the Polhemus property, had been acquired by the Northern Group on July 18, 1951, and was encumbered by two deeds of trust securing an indebtedness of $1,800,000. It was agreed that the parties would form partnerships or corporations to subdivide and improve the property and that the Northern Group would convey title to such partnerships or corporations, subject to the outstanding indebtedness. As an initial step in the venture, it was further agreed that $100,000 of the funds of the venture should first be used to secure a release of the liens on 76 acres, which were to be developed by the installation of street improvements and public utilities and by the construction of 200 single-family residences thereon.
. Under the terms of the agreement, each group had a 50-percent interest in the venture. The interest appearing in the name of David Belinkoff was actually owned one-half by him and one-half by Sol Goldenberg.
65. On January 17,1952, the two groups formed a separate partnership under the name of Junior Estates Co., which was formed to subdivide, improve, and develop the 76-acre tract of land described in the preceding finding and identified as Tract No. 650. The articles of partnership contemplated the completion and sale of 200 family homes on the tract and stated that the partnership was to begin as of January 17, 1952, and to terminate on January 16, 1954. On April 1, 1952, the partnership contracted with the American Construction Co. to erect 192 single-family residences on Tract *459 No. 650. Between September 16, 1952 and April 27, 1958, notices showing the completion of the improvements on approximately 187 lots in Tract No. 650 were filed and recorded in the records of San Mateo Comity.
66. In September 1952, the Southern Group sold its 50-percent interest in the partnership, Junior Estates Co., to one Phil Rosenberg, who purchased the interest in behalf of Hilldale Developers, Inc., a corporation. The total purchase price for the sale of the one-half interest was $204,750, payable as follows: $15,000 in cash and the balance in the form of three notes — one for $49,750 due March 5,1953, one for $70,000 due April 5, 1953, and the third for $70,000 due June 5, 1953.
Similarly, on September 25,1952, the Northern Group sold and assigned not only its interest in the partnership but also its entire interest in the joint venture and all rights in the land owned by the venture to the Bay Area Investment & Land Development Corp. The agreement of sale contemplated that the partnership interest acquired by the vendee would be transferred to Triangle Development Co., Inc., a California corporation and that the vendee would carry on a program for the subdivision and development of the land and the construction and sale of houses thereon.
67. On February 19,1953, Hilldale Developers, Inc., resold the half interest in Junior Estates Co. to Triangle Development Co., which had already acquired the other half interest and thus became the sole owner of Junior Estates Co. In the agreement of sale, Triangle assumed and agreed to pay the debt of Hilldale to the Southern Group. When Triangle subsequently defaulted in the payment of the indebtedness it had assumed, Triangle quitclaimed imsold houses to the Southern Group. These transactions occurred in March or April of 1954.
68. Record title to the Polhemus property was held by California Pacific Title Insurance Co. under a holding agreement for the benefit of all parties in interest. All of the houses constructed on the tract were sold by one broker and, as collections were received from the sales, the title company paid out the money to the individuals who actually owned the houses.
*460 During tbe year 1954, David Belinkoff and Sol Golden-berg received a total of $9,203.44 from the sale of the houses. The unrecovered cost of their partnership interest in Junior Estates was $8,142.10 and the total net profit received on sales in excess of such cost was $21,471.12. The contract price, i.e., the difference between the sales prices and the indebtedness to which the sales were subject totaled $33,536.39, and the percentage of the net profit received on the sales to the contract price was 64.0233.
69. In their tax returns, the sales were reported on the installment plan, and profits based on the percentage stated amounted to $5,892.35 in 1954. $2,946.18 or one-half of the profit belonged to Sol Goldenberg. In his 1954 income tax return, he included 50 percent of that amount as long-term capital gain. In his tax return for the same year, he also reported as long-term capital gain the sum of $1,503.90, which represented one-half of the moneys received by him in that year directly from Triangle Development Co. Inc., prior to the time it defaulted in the payment of the purchased money notes it had assumed.
70. In the joint venture of December 4,1951 (finding 64), it was contemplated that the remainder of the Polhemus tract (after the 76 acres were separated for Junior Estates Co.) would be subdivided and developed by the construction and sale of homes, the subdivision to be known as Baywood Park. On September 21, 1952, the Southern Group entered into a written agreement with Baywood Park Development Co., a California corporation, by which the Southern Group sold to the corporation “subject to the consents of the Bay Area Investment and Land Development Corp.”, the entire interest of the Southern Group in the joint venture of December 4, 1951, (reduced by the land included in Junior Estates Co.) and also the entire interest of the Southern Group in two parcels of land out of the Polhemus tract. One of these was an unsubdivided area and the other consisted of eight lots. As consideration for the transfer, the corporation agreed to pay the Southern Group $225,000, payable $500 upon the sale of each lot from the first parcel and $1,000 from the sale of each house in the second parcel.
*461 However, $50,000 was to be due and payable 12 months from the date of the contract; $62,000 not later than 18 months from the date of the contract, and the balance of $112,000 not more than 30 months from the date of the contract.
During the year 1954, Sol Goldenberg realized the sum of $856.74 from the transaction described above and included $428.37, or 50 percent thereof, in his 1954 tax return as long-term capital gain.
71. As stated in finding 54, the Commissioner of Internal Eevenue held that the income which Sol Goldenberg received from the Junior Estates and Baywood Park ventures was ordinary income, rather than long-term capital gain as reported by the taxpayer. Also as stated in finding 57, the claim for refund filed by Sol and Anna Goldenberg stated that the Commissioner had erred in treating the amounts received as ordinary income.
72. At the time they entered into the joint venture and the partnership involving the Junior Estates and Baywood Park, the business of subdividing, developing, and selling real estate was not the principal business or occupation of David Belinkoff or Sol Goldenberg. As previously stated, Mr. Belinkoff was the head of an accounting firm and Mr. Goldenberg was then the president of Golden West Bubber Products, Inc. However, when they entered into the venture and also when they formed the partnership known as Junior Estates Co., it was with the purpose and intention that the acreage of the Polhemus tract would be developed and subdivided into residential lots and that houses would be constructed on the lots and sold to the public.

Additional Factors Affecting Tax Oomputation

73. Plaintiffs Sol and Anna Goldenberg had an adjusted gross income for the year 1954 of $29,830.72, exclusive of the money received from the Foundation pursuant to the Purchase Agreement and the amounts received from the ventures in Junior Estates and Baywood Park. In 1954, they received the following amounts under the Purchase Agreement and from the j oint venture:
*462 (1) Under the Purchase Agreement — $63,213.36
(2) Amounts received from Junior Estates—
(a) Amount received from Triangle Development Co., Inc., prior to its default (finding 69)— $3,007.79.
(b) Amount received from the sale of houses (computed as stated in finding 68) — $2,946.18.
(3) Amount received from the vendee under the sale of December 4,1951 (finding 70) — $856.74.
In 1954 Sol and Anna Goldenberg had medical expenses of $7,615.97, other deductions of $4,379.36, and personal exemptions of $2,400.
74. Jerome and Helena Goldenberg had an adjusted gross income for the year of 1954 of $8,159.02, exclusive of $4,200.91, the full amount which they received under tho Purchase Agreement. In that year, they also had medical expenses of $1,509.25, other deductions of $550.56, and exemptions of $2,400.
75. Ida Goldenberg had an adjusted gross income in 1954 of $10,603.68, exclusive of the amount which she received under the Purchase Agreement. This amounted in total to $60,882.48. In the same year, she also had medical expenses of $2,610.45, other deductions of $2,557.26, and a personal exemption of $600.
76. In arriving at the foregoing amounts the taxpayers received in 1954 pursuant to the Purchase Agreement, a deduction is made for expenses of $17,000 which they incurred in connection with the Purchase Agreement. In the deficiency notices sent to the taxpayers in these three cases, however, the defendant ignored the expense deduction of $17,000 and treated the gross amount received by the taxpayers as ordinary income. Defendant also treated the amount received by Sol Goldenberg from the Junior Estates and Baywood Park ventures as ordinary income. The defendant’s disallowance of the medical expenses claimed by the taxpayers in 1954 resulted from an increase in their adjusted gross income through defendant’s determination that the amounts received under the Purchase Agreement, and in the case of Sol Goldenberg the amounts received from the joint venture, should be treated as ordinary income.
*463 COKCLXTSIOJST 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Buie 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amounts due thereunder, it was ordered on May 5, 1961, that judgments for plaintiffs be entered as follows:
No. 62-59_$34,395. 71
No. 53-59_ 1,040.83
No. 54-59_ 34,306.79
plus interest thereon as provided by law.