Emanuel N. (Manny) **KOLKEY** and Pauline Kolkey, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**BARNET PEREL** and Bertha Perel, Maurice L. Cowen and Rosalie Cowen, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

Nos. 12126, 12127.

United States Court of Appeals Seventh Circuit.

April 17, 1958.

**52**

James W. Breen, Samuel E. Hirsch, Chicago, Ill., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Louise Foster, Atty., Tax Division, U. S. Department of Justice, Washington, D. C., Lee A. Jackson, Harry Baum, Attys., Department of Justice, Washington, D. C., for respondent.

Before FINNEGAN and HASTINGS, Circuit Judges, and WHAM, District Judge.

FINNEGAN, Circuit Judge.

Claiming their transactions detailed by the Tax Court in an opinion reported as Kolkey v. C. I. R., 1956, 27 T.C. 37, was a sale of stock and consequently the derivative profits are taxable on the basis of an installment capital gain, taxpayers ask for reversal of that Court's final order and suspension of deficiencies assessed against each of them.[1] Our study of the bundle of documentary exhibits and the extensive transcript of testimony taken at the trial stage assures us that the evidentiary basis for the Tax Court's determination warrants leaving its fact findings undisturbed, and, accordingly, permits capsuling some facts for this opinion. I.R.C.1954, § 7482, 68A Stat. 890, 26 U.S.C. § 7482; Rule 52, Federal Rules of Civil Procedure, 28 U.S.C. This treatment, far from impeaching the lengthy, and we think sound, factual recital written by the Tax Court Judge, simply means we think it unnecessary to repeat all that factual material. When appraising this record, we were acutely aware that Judge Pierce prepared his opinion from the same record and without observing the witnesses, because he took over the task when the trial judge died.

Kolkey, Perel and Cowen owned all the outstanding capital stock of Continental Pharmaceutical Corporation, Distributors which, at the critical moment, had earned surplus and undivided profits of $597,989.35. Since distribution of all or part of that amount would result in dividend receipts taxable as ordinary income, their problem was how to convert the potential distribution into a transaction legally entitled to the preferential treatment allowed capital gains. Kolkey, Perel and Cowen, employed "Finders" to locate a tax-exempt organization interested in buying all their capital stock in Continental, which for the second fiscal period, as an illustration, through merchandising a weight reducing remedy (Kyron) had net sales of $2,655,258.-

1. In the Tax Court the following cases were consolidated: Pauline Kolkey, Doc. No. 44520; Kyron Foundation, Inc., Doc. No. 44818; Emanuel N. (Manny) Kolkey, Doc. No. 44850; Barnet Perel and Bertha Perel, Doc. No. 45063; Maurice L. Cowen and Rosalie Cowen, Doc. No. 45064. The wives of Cowen, Perel and Kolkey are involved only because joint tax returns were filed. By an order of our court Emanuel N. (Manny) Kolkey was granted leave to adopt the appendix filed in appeal No. 12127. We heard appeals numbered 12126, 12127 together.

41. The search unearthed Survey Associates, Inc. (tax exempt under 19 B.T.A. 595; Comm.Acq. IX–39–4783–2CB15). Under an agreement with Continental and Survey a new corporation, Kyron Foundation, Inc. was organized with capital stock of $1000 and for that sum donated by two directors of Survey, their Corporation received Kyron's only outstanding shares. Acting for Kolkey and themselves, Perel and Cowen transferred all their Continental stock to Kyron in exchange for $4,000,000 of Kyron's corporate notes—neither endorsed nor guaranteed by any other party. The individual taxpayers also received, as sole "collateral" for such notes, the outstanding 10 shares of Kyron stock, which Survey supplied after endorsing those certificates in blank and obtaining undated resignations of all Kyron directors and officers, some of whom were Survey's representatives.

"Kyron, immediately after so acquiring all stock of Continental, caused that corporation to adopt a plan of complete liquidation, under which all assets and liabilities would be turned over to Kyron. The latter then accepted such assets, assumed the liabilities, and surrendered the Continental stock for cancellation.

"Kyron thereupon pledged the accounts receivable taken over from Continental, to a factoring firm, for the sum of $350,000; and then immediately turned over to Cowen and Perel in cancellation of the $400,000 demand notes, not only the factor's checks for $350,000, but also $50,000 in checks of its own which were drawn on one of the bank accounts taken over from Continental. The rate of interest on the factor's loan was 1/30th of 1 per cent per day, which equals about 12 per cent per annum.

"The agreed management contract was then executed, under which Cowen, Perel and Kolkey were given broad powers to handle the operation of the business for a period of 7 years, with annual salaries of $25,000 each. (Kolkey never signed this contract, but he acted thereunder and received the salary.)

"$125,000 demand notes payable to Kolkey, Cowen and Perel, which Continental had issued in part payment for the office building used in the business, were refunded by Kyron with installment notes payable over a 10-year period.

"Kyron paid, out of one of the bank accounts taken over from Continental, $25,000 to the attorneys who had represented Survey, for legal services in connection with the foregoing transactions. All the foregoing steps were completed within a period of about 3 or 4 hours, on the afternoon of March 14, 1949.

"The effect of the foregoing transactions on the current assets of Kyron was: The cash of $172,117.08 taken over from Continental was reduced by $74,000, representing the difference between the $1,000 received from Survey, and the checks of $50,000 issued to Cowen and Perel and of $25,000 issued for legal services; and all the accounts receivable were encumbered by an obligation of $350,000, which was the amount borrowed thereon from the factor and paid to Cowen and Perel on the demand notes. These reductions in the current assets, plus the setting up of the $3,600,000 installment notes as additional liabilities, would have produced a large capital deficit; and, therefore, in order to balance the books, a compensating asset entry was made in Kyron's balance sheet as of March 31, 1949, which read: 'Trade-Marks, Trade-Names, Patents, Copyrights, Goodwill, Etc.—$3,398,-939.40.' This entry was changed and explained in Kyron's balance sheet of February 28, 1950, as follows: 'Intangible Asset (Representing the excess of Cost over Book Value of Net Assets Acquired from Predecessor Company as at Date of

Acquisition)—$3,450,711.09.' * * In addition to the foregoing amounts, Cowen and his associates were to receive 2½ per cent interest on all unpaid installments of principal. The amounts of such interest obligation for the first two of the above periods only, for which deductions were subsequently claimed, were $86,949.67 and $90,050.33, respectively.

"The cash and installment notes which Cowen and Perel received on March 14, 1949, in the above-mentioned transactions were dealt with by them as follows: Of the $400,000 cash received, $55,000 was paid to the Finders, the business broker, and their attorney, for commissions and legal services; and the balance of $345,000 was allocated among Kolkey, Cowen and Perel, in the proportions that they had previously held the Continental stock, to wit: 55 per cent to Kolkey, and 22½ per cent to each of the others. As to the $3,600,000 installment notes, these were likewise allocated among the three of them, in the proportions that they had held the Continental stock. For the purpose of such allocation, Perel endorsed and delivered to Kolkey, without recourse, one of the $1,800,000 installment notes; and he and Kolkey attached thereto a statement to the effect that the note had been 'the actual legal and equitable property' of Kolkey from the beginning. The other note, made payable to Cowen, was retained by him; but it was agreed that 5 per cent of the same belonged to Kolkey, and that the balance belonged to Cowen and Perel in equal portions.

"Following the above-mentioned transactions of March 14, 1949, Kolkey, Cowen and Perel conducted the business operations of Kyron, in the capacity of 'managers,' from the same offices, in substantially the same manner, and with the performance of the same duties, as they had previously operated Continental in the capacity of officers."

However, we again underscore our point that this truncated version of the evidence is in no way indicative of how far our canvass of this record proceeded.

Taxpayers treated the $400,000 payment by Kyron to them, as an installment of proceeds from a sale of Continental's assets, reporting their proportionate share as capital gains, and the Tax Court, correctly, sustained the Commissioner's determination that the amounts were dividends and ordinary income. I.R.C.1939, § 22, 26 U.S.C. § 22. The short of it is that under all the facts and circumstances the Tax Court judge remained unpersuaded that Kolkey, Perel and Cowen became Kyron's creditors. Doyle v. Mitchell Brothers Co., 1918, 247 U.S. 179, 38 S.Ct. 467, 62 L.Ed. 1054; Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 1942, 132 F.2d 182, and we think he reached the right result. Despite the transfer of their Continental Shares these individual taxpayers maintained a death grip on Kyron. Whether these maneuvers are characterized as integrated steps of one transaction under Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, or in some other fashion, one thing is clear and that is by using several legal switches these taxpayers connected up a closed circuit whereby the output of Continental's undistributed earnings and profits must flow to Kolkey, Perel and Cowen whenever the corresponding relay, Kyron, was energized. The view the Tax Court took of the sum of these conditions patterned by the taxpayers can be verified from a survey of this record. The manifestations taxpayers claim for their "arm's length" transaction are at best equivocal and unconvincing.

Judgment affirmed.