COMMISSIONER OF INTERNAL REVENUE
*v.* BROWN ET AL.

No. 63. Argued March 3, 1965.—Decided April 27, 1965.

564

*Wayne G. Barnett* argued the cause for petitioner. With him on the briefs were *Solicitor General Cox, Assistant Attorney General Oberdorfer* and *Ernest J. Brown.*

*William H. Kinsey* argued the cause for respondents. With him on the brief were *James R. Moore, James A. Larpenteur, Jr.,* and *Robert T. Mautz.*

Briefs of *amici curiae,* urging affirmance, were filed by *Arthur A. Armstrong* for West Los Angeles Institute for Cancer Research, and by *Dana Latham, John H. Hall, Joseph D. Peeler* and *John E. Scheifly.*

MR. JUSTICE WHITE delivered the opinion of the Court.

In 1950, when Congress addressed itself to the problem of the direct or indirect acquisition and operation of going businesses by charities or other tax-exempt entities, it was recognized that in many of the typical sale and lease-back transactions, the exempt organization was trading on and perhaps selling part of its exemption. H. R. Rep. No. 2319, 81st Cong., 2d Sess., pp. 38–39; S. Rep. No. 2375, 81st Cong., 2d Sess., pp. 31–32. For this and other reasons the Internal Revenue Code was accordingly amended in several respects, of principal importance for our purposes by taxing as "unrelated business income" the profits earned by a charity in the operation of a business, as well as the income from long-term leases of the business.[1] The short-term lease, however, of five years or

---

[1] The Revenue Act of 1950, c. 994, 64 Stat. 906, amended § 101 of the Internal Revenue Code of 1939 and added §§ 421 through 424, 3813 and 3814. These sections are now §§ 501 through 504 and 511 through 515 of the Internal Revenue Code of 1954.

less, was not affected and this fact has moulded many of the transactions in this field since that time, including the one involved in this case.[2]

The Commissioner, however, in 1954, announced that when an exempt organization purchased a business and leased it for five years to another corporation, not investing its own funds but paying off the purchase price with rental income, the purchasing organization was in danger of losing its exemption; that in any event the rental income would be taxable income; that the charity might be unreasonably accumulating income; and finally, and most important for this case, that the payments received by the seller would not be entitled to capital gains treatment. Rev. Rul. 54–420, 1954–2 Cum. Bull. 128.

This case is one of the many in the course of which the Commissioner has questioned the sale of a business concern to an exempt organization.[3] The basic facts are un-

---

[2] The sale and leaseback transaction has been much examined. Lanning, Tax Erosion and the "Bootstrap Sale" of a Business–I, 108 U. Pa. L. Rev. 623 (1960); Moore and Dohan, Sales, Churches, and Monkeyshines, 11 Tax L. Rev. 87 (1956); MacCracken, Selling a Business to a Charitable Foundation, 1954 U. So. Cal. Tax Inst. 205; Comment, The Three-Party Sale and Lease-Back, 61 Mich. L. Rev. 1140 (1963); Alexander, The Use of Foundations in Business, 15 N. Y. U. Tax Inst. 591 (1957); New Developments in Tax-exempt Institutions, 19 J. Taxation 302 (1963). See also Stern, The Great Treasury Raid, p. 245 (1964).

[3] *Union Bank* v. *United States*, 152 Ct. Cl. 426, 285 F. 2d 126; *Commissioner* v. *Johnson*, 267 F. 2d 382, aff'g *Estate of Howes* v. *Commissioner*, 30 T. C. 909; *Kolkey* v. *Commissioner*, 254 F. 2d 51; *Knapp Bros. Shoe Mfg. Corp.* v. *United States*, 135 Ct. Cl. 797, 142 F. Supp. 899; *Oscar C. Stahl*, P–H 1963 TC Mem. Dec. ¶ 63,201; *Isis Windows, Inc.*, P–H 1963 TC Mem. Dec. ¶ 63,176; *Ralph M. Singer*, P–H 1963 TC Mem. Dec. ¶ 63,158; *Brekke* v. *Commissioner*, 40 T. C. 789; *Royal Farms Dairy Co.* v. *Commissioner*, 40 T. C. 172; *Anderson Dairy, Inc.* v. *Commissioner*, 39 T. C. 1027; *Estate of Hawthorne*, P–H 1960 TC Mem. Dec. ¶ 60,146; *Estate of Hawley*, P–H 1961 TC Mem. Dec. ¶ 61,038; *Ohio Furnace Co.* v. *Commis-*

disputed. Clay Brown, members of his family and three other persons owned substantially all of the stock in Clay Brown & Company, with sawmills and lumber interests near Fortuna, California. Clay Brown, the president of the company and spokesman for the group, was approached by a representative of California Institute for Cancer Research in 1952, and after considerable negotiation the stockholders agreed to sell their stock to the Institute for $1,300,000, payable $5,000 down from the assets of the company and the balance within 10 years from the earnings of the company's assets. It was provided that simultaneously with the transfer of the stock, the Institute would liquidate the company and lease its assets for five years to a new corporation, Fortuna Sawmills, Inc., formed and wholly owned by the attorneys for the sellers.[4] Fortuna would pay to the Institute 80% of its operating profit without allowance for depreciation or taxes, and 90% of such payments would be paid over by the Institute to the selling stockholders to apply on the $1,300,000 note. This note was noninterest bearing, the Institute had no obligation to pay it except from the rental income and it was secured by mortgages and assignments of the assets transferred or leased to Fortuna. If the payments on the note failed to total $250,000 over any two consecutive years, the sellers could declare the entire balance of the note due and payable. The sellers were neither stockholders nor directors of Fortuna but it was provided that Clay Brown was to have a management con-

---

*sioner*, 25 T. C. 179; *Truschel* v. *Commissioner*, 29 T. C. 433. Some of these cases are now pending on appeal in one or more of the courts of appeals.

[4] The net current assets subject to liabilities were sold by the Institute to Fortuna for a promissory note which was assigned to sellers. The lease covered the remaining assets of Clay Brown & Company. Fortuna was capitalized at $25,000, its capital being paid in by its stockholders from their own funds.

tract with Fortuna at an annual salary and the right to name any successor manager if he himself resigned.[5]

The transaction was closed on February 4, 1953. Fortuna immediately took over operations of the business under its lease, on the same premises and with practically the same personnel which had been employed by Clay Brown & Company. Effective October 31, 1954, Clay Brown resigned as general manager of Fortuna and waived his right to name his successor. In 1957, because of a rapidly declining lumber market, Fortuna suffered severe reverses and its operations were terminated. Respondent sellers did not repossess the properties under their mortgages but agreed they should be sold by the Institute with the latter retaining 10% of the proceeds. Accordingly, the property was sold by the Institute for $300,000. The payments on the note from rentals and from the sale of the properties totaled $936,131.85. Respondents returned the payments received from rentals as the gain from the sale of capital assets. The Commissioner, however, asserted the payments were taxable as ordinary income and were not capital gain within the meaning of I. R. C. 1939, § 117 (a)(4) and I. R. C. 1954, § 1222 (3). These sections provide that "[t]he term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months . . . ."

In the Tax Court, the Commissioner asserted that the transaction was a sham and that in any event respondents retained such an economic interest in and control over the property sold that the transaction could not be treated as a sale resulting in a long-term capital gain. A divided Tax Court, 37 T. C. 461, found that there had

---

[5] Clay Brown's personal liability for some of the indebtedness of Clay Brown & Company, assumed by Fortuna, was continued. He also personally guaranteed some additional indebtedness incurred by Fortuna.

been considerable good-faith bargaining at arm's length between the Brown family and the Institute, that the price agreed upon was within a reasonable range in the light of the earnings history of the corporation and the adjusted net worth of its assets, that the primary motivation for the Institute was the prospect of ending up with the assets of the business free and clear after the purchase price had been fully paid, which would then permit the Institute to convert the property and the money for use in cancer research, and that there had been a real change of economic benefit in the transaction.[6]  Its conclusion was that the transfer of respondents' stock in Clay Brown & Company to the Institute was a bona fide sale arrived at in an arm's-length transaction and that the amounts received by respondents were proceeds from the sale of stock and entitled to long-term capital gains treatment under the Internal Revenue Code.  The Court of Appeals affirmed, 325 F. 2d 313, and we granted certiorari, 377 U. S. 962.

Having abandoned in the Court of Appeals the argument that this transaction was a sham, the Commissioner now admits that there was real substance in what occurred between the Institute and the Brown family.  The transaction was a sale under local law.  The Institute acquired title to the stock of Clay Brown & Company and, by liquidation, to all of the assets of that company, in return for its promise to pay over money from the operating profits of the company.  If the stipulated price was paid, the Brown family would forever lose all rights to the income and properties of the company.  Prior to the transfer, these respondents had access to all of the income of the company; after the transfer, 28% of the income remained with Fortuna and the Institute.  Respondents

---

[6] The Tax Court found nothing to indicate that the arrangement between the stockholders and the Institute contemplated the Brown family's being free at any time to take back and operate the business.

had no interest in the Institute nor were they stockholders or directors of the operating company. Any rights to control the management were limited to the management contract between Clay Brown and Fortuna, which was relinquished in 1954.

Whatever substance the transaction might have had, however, the Commissioner claims that it did not have the substance of a sale within the meaning of § 1222 (3). His argument is that since the Institute invested nothing, assumed no independent liability for the purchase price and promised only to pay over a percentage of the earnings of the company, the entire risk of the transaction remained on the sellers. Apparently, to qualify as a sale, a transfer of property for money or the promise of money must be to a financially responsible buyer who undertakes to pay the purchase price other than from the earnings or the assets themselves or there must be a substantial down payment which shifts at least part of the risk to the buyer and furnishes some cushion against loss to the seller.

To say that there is no sale because there is no risk-shifting and that there is no risk-shifting because the price to be paid is payable only from the income produced by the business sold, is very little different from saying that because business earnings are usually taxable as ordinary income, they are subject to the same tax when paid over as the purchase price of property. This argument has rationality but it places an unwarranted construction on the term "sale," is contrary to the policy of the capital gains provisions of the Internal Revenue Code, and has no support in the cases. We reject it.

"Capital gain" and "capital asset" are creatures of the tax law and the Court has been inclined to give these terms a narrow, rather than a broad, construction. *Corn Products Co.* v. *Commissioner*, 350 U. S. 46, 52. A "sale," however, is a common event in the non-tax world; and

since it is used in the Code without limiting definition and without legislative history indicating a contrary result, its common and ordinary meaning should at least be persuasive of its meaning as used in the Internal Revenue Code. "Generally speaking, the language in the Revenue Act, just as in any statute, is to be given its ordinary meaning, and the words 'sale' and 'exchange' are not to be read any differently." *Helvering* v. *Flaccus Leather Co.,* 313 U. S. 247, 249; *Hanover Bank* v. *Commissioner,* 369 U. S. 672, 687; *Commissioner* v. *Korell,* 339 U. S. 619, 627–628; *Crane* v. *Commissioner,* 331 U. S. 1, 6; *Lang* v. *Commissioner,* 289 U. S. 109, 111; *Old Colony R. Co.* v. *Commissioner,* 284 U. S. 552, 560.

"A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent," *Iowa* v. *McFarland,* 110 U. S. 471, 478; it is a contract "to pass rights of property for money,—which the buyer pays or promises to pay to the seller . . . ," *Williamson* v. *Berry,* 8 How. 495, 544. Compare the definition of "sale" in § 1 (2) of the Uniform Sales Act and in § 2–106 (1) of the Uniform Commercial Code. The transaction which occurred in this case was obviously a transfer of property for a fixed price payable in money.

Unquestionably the courts, in interpreting a statute, have some "scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results . . . or would thwart the obvious purpose of the statute." *Helvering* v. *Hammel,* 311 U. S. 504, 510–511; cf. *Commissioner* v. *Gillette Motor Co.,* 364 U. S. 130, 134, and *Commissioner* v. *P. G. Lake, Inc.,* 356 U. S. 260, 265. But it is otherwise "where no such consequences would follow and where . . . it appears to be consonant with the purposes of the Act . . . ." *Helvering* v. *Hammel, supra,* at 511; *Ozawa* v. *United States,* 260 U. S. 178, 194. We find nothing in this case indicating that the Tax Court or the

Court of Appeals construed the term "sale" too broadly or in a manner contrary to the purpose or policy of capital gains provisions of the Code.

Congress intended to afford capital gains treatment only in situations "typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." *Commissioner* v. *Gillette Motor Co.,* 364 U. S. 130, 134. It was to "relieve the taxpayer from . . . excessive tax burdens on gains resulting from a conversion of capital investments" that capital gains were taxed differently by Congress. *Burnet* v. *Harmel,* 287 U. S. 103, 106; *Commissioner* v. *P. G. Lake, Inc.,* 356 U. S. 260, 265.

As of January 31, 1953, the adjusted net worth of Clay Brown & Company as revealed by its books was $619,457.63. This figure included accumulated earnings of $448,471.63, paid in surplus, capital stock and notes payable to the Brown family. The appraised value as of that date, however, relied upon by the Institute and the sellers, was $1,064,877, without figuring interest on deferred balances. Under a deferred payment plan with a 6% interest figure, the sale value was placed at $1,301,989. The Tax Court found the sale price agreed upon was arrived at in an arm's-length transaction, was the result of real negotiating and was "within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of the corporate assets." 37 T. C. 461, 486.

Obviously, on these facts, there had been an appreciation in value accruing over a period of years, *Commissioner* v. *Gillette Motor Co., supra,* and an "increase in the value of the income-producing property." *Commissioner* v. *P. G. Lake, Inc., supra,* at 266. This increase taxpayers were entitled to realize at capital gains rates on a cash sale of their stock; and likewise if they sold on a deferred pay-

ment plan taking an installment note and a mortgage as security. Further, if the down payment was less than 30% (the 1954 Code requires no down payment at all) and the transaction otherwise satisfied I. R. C. 1939, § 44, the gain itself could be reported on the installment basis.

In the actual transaction, the stock was transferred for a price payable on the installment basis but payable from the earnings of the company. Eventually $936,131.85 was realized by respondents. This transaction, we think, is a sale, and so treating it is wholly consistent with the purposes of the Code to allow capital gains treatment for realization upon the enhanced value of a capital asset.

The Commissioner, however, embellishes his risk-shifting argument. Purporting to probe the economic realities of the transaction, he reasons that if the seller continues to bear all the risk and the buyer none, the seller must be collecting a price for his risk-bearing in the form of an interest in future earnings over and above what would be a fair market value of the property. Since the seller bears the risk, the so-called purchase price *must* be excessive and *must* be simply a device to collect future earnings at capital gains rates.

We would hesitate to discount unduly the power of pure reason and the argument is not without force. But it does present difficulties. In the first place, it denies what the tax court expressly found—that the price paid was within reasonable limits based on the earnings and net worth of the company; and there is evidence in the record to support this finding. We do not have, therefore, a case where the price has been found excessive.

Secondly, if an excessive price is such an inevitable result of the lack of risk-shifting, it would seem that it would not be an impossible task for the Commissioner to demonstrate the fact. However, in this case he offered no evidence whatsoever to this effect; and in a good many other cases involving similar transactions, in some of which

the reasonableness of the price paid by a charity was actually contested, the Tax Court has found the sale price to be within reasonable limits, as it did in this case.[7]

Thirdly, the Commissioner ignores as well the fact that if the rents payable by Fortuna were deductible by it and not taxable to the Institute, the Institute could pay off the purchase price at a considerably faster rate than the ordinary corporate buyer subject to income taxes, a matter of considerable importance to a seller who wants the balance of his purchase price paid as rapidly as he can get it. The fact is that by April 30, 1955, a little over two years after closing this transaction, $412,595.77 had been paid on the note and within another year the sellers had collected another $238,498.80, for a total of $651,094.57.

Furthermore, risk-shifting of the kind insisted on by the Commissioner has not heretofore been considered an essential ingredient of a sale for tax purposes. In *LeTulle v. Scofield,* 308 U. S. 415, one corporation transferred properties to another for cash and bonds secured by the properties transferred. The Court held that there was "a sale or exchange upon which gain or loss must be reckoned in accordance with the provisions of the revenue act dealing with the recognition of gain or loss upon a sale or exchange," *id.,* at 421, since the seller retained only

---

[7] In all but four of the cases listed in note 3, *supra,* there was a finding that the price was within permissible limits. The exceptions are: *Kolkey v. Commissioner,* where the price was considered grossly excessive and the transaction a sham; *Union Bank v. United States,* in which the Court of Claims referred to the evidence of excessive price but nevertheless held a sale had taken place; *Brekke v. Commissioner,* where the seller was not before the court, the price was said to be twice the fair market value and the issue was the deductibility of the rent paid by the operating company to the exempt organization; and *Estate of Hawley,* in which there was no express treatment of the sale price, but the transaction was found to be a bona fide sale.

a creditor's interest rather than a proprietary one. "[T]hat the bonds were secured solely by the assets transferred and that, upon default, the bondholder would retake only the property sold, [did not change] his status from that of a creditor to one having a proprietary stake." *Ibid.* Compare *Marr* v. *United States,* 268 U. S. 536. To require a sale for tax purposes to be to a financially responsible buyer who undertakes to pay the purchase price from sources other than the earnings of the assets sold or to make a substantial down payment seems to us at odds with commercial practice and common understanding of what constitutes a sale. The term "sale" is used a great many times in the Internal Revenue Code and a wide variety of tax results hinge on the occurrence of a "sale." To accept the Commissioner's definition of sale would have wide ramifications which we are not prepared to visit upon taxpayers, absent congressional guidance in this direction.

The Commissioner relies heavily upon the cases involving a transfer of mineral interests, the transferor receiving a bonus and retaining a royalty or other interest in the mineral production. *Burnet* v. *Harmel,* 287 U. S. 103; *Palmer* v. *Bender,* 287 U. S. 551; *Thomas* v. *Perkins,* 301 U. S. 655; *Kirby Petroleum Co.* v. *Commissioner,* 326 U. S. 599; *Burton-Sutton Oil Co.* v. *Commissioner,* 328 U. S. 25; *Commissioner* v. *Southwest Exploration Co.,* 350 U. S. 308. *Thomas* v. *Perkins* is deemed particularly pertinent. There a leasehold interest was transferred for a sum certain payable in oil as produced, and it was held that the amounts paid to the transferor were not includable in the income of the transferee but were income of the transferor. We do not, however, deem either *Thomas* v. *Perkins* or the other cases controlling.

First, "Congress . . . has recognized the peculiar character of the business of extracting natural resources," *Burton-Sutton Oil Co.* v. *Commissioner,* 328 U. S. 25, 33;

see *Stratton's Independence, Ltd.* v. *Howbert,* 231 U. S. 399, 413–414, which is viewed as an income-producing operation and not as a conversion of capital investment, *Anderson* v. *Helvering,* 310 U. S. 404, at 407, but one which has its own built-in method of allowing through depletion "a tax-free return of the capital consumed in the production of gross income through severance," *Anderson* v. *Helvering, supra,* at 408, which is independent of cost and depends solely on production, *Burton-Sutton,* at 34. Percentage depletion allows an arbitrary deduction to compensate for exhaustion of the asset, regardless of cost incurred or any investment which the taxpayer may have made. The Commissioner, however, would assess to respondents as ordinary income the entire amount of all rental payments made by the Institute, regardless of the accumulated values in the corporation which the payments reflected and without regard for the present policy of the tax law to allow the taxpayer to realize on appreciated values at the capital gains rates.

Second, *Thomas* v. *Perkins* does not have unlimited sweep. The Court in *Anderson* v. *Helvering, supra,* pointed out that it was still possible for the owner of a working interest to divest himself finally and completely of his mineral interest by effecting a sale. In that case the owner of royalty interest, fee interest and deferred oil payments contracted to convey them for $160,000 payable $50,000 down and the balance from one-half the proceeds which might be derived from the oil and gas produced and from the sale of the fee title to any of the lands conveyed. The Court refused to extend *Thomas* v. *Perkins* beyond the oil payment transaction involved in that case. Since the transferor in *Anderson* had provided for payment of the purchase price from the sale of fee interest as well as from the production of oil and gas, "the reservation of this additional type of security for the deferred payments serve[d] to distinguish this case from

*Thomas* v. *Perkins.* It is similar to the reservation in a lease of oil payment rights together with a personal guarantee by the lessee that such payments shall at all events equal the specified sum." *Anderson* v. *Helvering, supra,* at 412–413. Hence, there was held to be an outright sale of the properties, all of the oil income therefrom being taxable to the transferee notwithstanding the fact of payment of part of it to the seller. The respondents in this case, of course, not only had rights against income, but if the income failed to amount to $250,000 in any two consecutive years, the entire amount could be declared due, which was secured by a lien on the real and personal properties of the company.[8]

---

[8] Respondents place considerable reliance on the rule applicable where patents are sold or assigned, the seller or assignor reserving an income interest. In Rev. Rul. 58–353, 1958–2 Cum. Bull. 408, the Service announced its acquiescence in various Tax Court cases holding that the consideration received by the owner of a patent for the assignment of a patent or the granting of an exclusive license to such patent may be treated as the proceeds of a sale of property for income tax purposes, even though the consideration received by the transferor is measured by production, use, or sale of the patented article. The Government now says that the Revenue Ruling amounts only to a decision to cease litigating the question, at least temporarily, and that the cases on which the rule is based are wrong in principle and inconsistent with the cases dealing with the taxation of mineral interests. We note, however, that in Rev. Rul. 60–226, 1960–1 Cum. Bull. 26, the Service extended the same treatment to the copyright field. Furthermore, the Secretary of the Treasury in 1963 recognized the present law to be that "the sale of a patent by the inventor may be treated as the sale of a capital asset," Hearings before the House Committee on Ways and Means, 88th Cong., 1st Sess., Feb. 6, 7, 8 and 18, 1963, Pt. I (rev.), on the President's 1963 Tax Message, p. 150, and the Congress failed to enact the changes in the law which the Department recommended.

These developments in the patent field obviously do not help the position of the Commissioner. Nor does I. R. C. 1954, § 1235, which expressly permits specified patent sales to be treated as sales of capital assets entitled to capital gains treatment. We need not, however,

There is another reason for us not to disturb the ruling of the Tax Court and the Court of Appeals. In 1963, the Treasury Department, in the course of hearings before the Congress, noted the availability of capital gains treatment on the sale of capital assets even though the seller retained an interest in the income produced by the assets. The Department proposed a change in the law which would have taxed as ordinary income the payments on the sale of a capital asset which were deferred over more than five years and were contingent on future income. Payments, though contingent on income, required to be made within five years would not have lost capital gains status nor would payments not contingent on income even though accompanied by payments which were. Hearings before the House Committee on Ways and Means, 88th Cong., 1st Sess., Feb. 6, 7, 8 and 18, 1963, Pt. I (rev.), on the President's 1963 Tax Message, pp. 154–156.

Congress did not adopt the suggested change [9] but it is significant for our purposes that the proposed amendment did not deny the fact or occurrence of a sale but would have taxed as ordinary income those income-contingent

_____

decide here whether the extraction and patent cases are irreconcilable or whether, instead, each situation has its own peculiar characteristics justifying discrete treatment under the sale and exchange language of § 1222. Whether the patent cases are correct or not, absent § 1235, the fact remains that this case involves the transfer of corporate stock which has substantially appreciated in value and a purchase price payable from income which has been held to reflect the fair market value of the assets which the stock represents.

[9] It did, however, accept and enact another suggestion made by the Treasury Department. Section 483, which was added to the Code, provided for treating a part of the purchase price as interest in installment sales transactions where no interest was specified. The provision was to apply as well when the payments provided for were indefinite as to their size, as for example "where the payments are in part at least dependent upon future income derived from the property." S. Rep. No. 830, 88th Cong., 2d Sess., p. 103. This section would apparently now apply to a transaction such as occurred in this case.

payments deferred for more than five years. If a purchaser could pay the purchase price out of earnings within five years, the seller would have capital gain rather than ordinary income. The approach was consistent with allowing appreciated values to be treated as capital gain but with appropriate safeguards against reserving additional rights to future income. In comparison, the Commissioner's position here is a clear case of "overkill" if aimed at preventing the involvement of tax-exempt entities in the purchase and operation of business enterprises. There are more precise approaches to this problem as well as to the question of the possibly excessive price paid by the charity or foundation. And if the Commissioner's approach is intended as a limitation upon the tax treatment of sales generally, it represents a considerable invasion of current capital gains policy, a matter which we think is the business of Congress, not ours.

The problems involved in the purchase of a going business by a tax-exempt organization have been considered and dealt with by the Congress. Likewise, it has given its attention to various kinds of transactions involving the payment of the agreed purchase price for property from the future earnings of the property itself. In both situations it has responded, if at all, with precise provisions of narrow application. We consequently deem it wise to "leave to the Congress the fashioning of a rule which, in any event, must have wide ramifications." *American Automobile Assn.* v. *United States,* 367 U. S. 687, 697.

*Affirmed.*

MR. JUSTICE HARLAN, concurring.

Were it not for the tax laws, the respondents' transaction with the Institute would make no sense, except as one arising from a charitable impulse. However the tax laws exist as an economic reality in the businessman's world, much like the existence of a competitor. Businessmen

plan their affairs around both, and a tax dollar is just as real as one derived from any other source. The Code gives the Institute a tax exemption which makes it capable of taking a greater after-tax return from a business than could a nontax-exempt individual or corporation. Respondents traded a residual interest in their business for a faster payout apparently made possible by the Institute's exemption. The respondents gave something up; they received something substantially different in return. If words are to have meaning, there was a "sale or exchange."

Obviously the Institute traded on its tax exemption. The Government would deny that there was an exchange, essentially on the theory that the Institute did not put anything at risk; since its exemption is unlimited, like the magic purse that always contains another penny, the Institute gave up nothing by trading on it.

One may observe preliminarily that the Government's remedy for the so-called "bootstrap" sale—defining sale or exchange so as to require the shifting of some business risks—would accomplish little by way of closing off such sales in the future. It would be neither difficult nor burdensome for future users of the bootstrap technique to arrange for some shift of risks. If such sales are considered a serious abuse, ineffective judicial correctives will only postpone the day when Congress is moved to deal with the problem comprehensively. Furthermore, one may ask why, if the Government does not like the tax consequences of such sales, the proper course is not to attack the exemption rather than to deny the existence of a "real" sale or exchange.

The force underlying the Government's position is that the respondents did clearly retain some risk-bearing interest in the business. Instead of leaping from this premise to the conclusion that there was no sale or exchange, the Government might more profitably have

broken the transaction into components and attempted to distinguish between the interest which respondents retained and the interest which they exchanged. The worth of a business depends upon its ability to produce income over time. What respondents gave up was not the entire business, but only their interest in the business' ability to produce income in excess of that which was necessary to pay them off under the terms of the transaction. The value of such a residual interest is a function of the risk element of the business and the amount of income it is capable of producing per year, and will necessarily be substantially less than the value of the total business. Had the Government argued that it was that interest which respondents exchanged, and only to that extent should they have received capital gains treatment, we would perhaps have had a different case.

I mean neither to accept nor reject this approach, or any other which falls short of the all-or-nothing theory specifically argued by the petitioner, specifically opposed by the respondents, and accepted by the Court as the premise for its decision. On a highly complex issue with as wide ramifications as the one before us, it is vitally important to have had the illumination provided by briefing and argument directly on point before any particular path is irrevocably taken. Where the definition of "sale or exchange" is concerned, the Court can afford to proceed slowly and by stages. The illumination which has been provided in the present case convinces me that the position taken by the Government is unsound and does not warrant reversal of the judgment below. Therefore I concur in the judgment to affirm.

MR. JUSTICE GOLDBERG, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK join, dissenting.

The essential facts of this case which are undisputed illuminate the basic nature of the transaction at issue.

Respondents conveyed their stock in Clay Brown & Co.,
a corporation owned almost entirely by Clay Brown and
the members of his immediate family, to the California
Institute for Cancer Research, a tax-exempt foundation.
The Institute liquidated the corporation and transferred
its assets under a five-year lease to a new corporation, For-
tuna, which was managed by respondent Clay Brown, and
the shares of which were in the name of Clay Brown's at-
torneys, who also served as Fortuna's directors. The busi-
ness thus continued under a new name with no essential
change in control of its operations. Fortuna agreed to
pay 80% of its pretax profits to the Institute as rent under
the lease, and the Institute agreed to pay 90% of this
amount to respondents in payment for their shares until
the respondents received $1,300,000, at which time their
interest would terminate and the Institute would own the
complete beneficial interest as well as all legal interest in
the business. If remittances to respondents were less
than $250,000 in any two consecutive years or any other
provision in the agreements was violated, they could re-
cover the property. The Institute had no personal lia-
bility. In essence respondents conveyed their interest in
the business to the Institute in return for 72% of the
profits of the business and the right to recover the business
assets if payments fell behind schedule.

At first glance it might appear odd that the sellers
would enter into this transaction, for prior to the sale they
had a right to 100% of the corporation's income, but after
the sale they had a right to only 72% of that income and
would lose the business after 10 years to boot. This
transaction, however, afforded the sellers several advan-
tages. The principal advantage sought by the sellers was
capital gain, rather than ordinary income, treatment for
that share of the business profits which they received.
Further, because of the Tax Code's charitable exemption [1]

---

[1] See I. R. C. 1954, § 501 (c) (3).

and the lease arrangement with Fortuna,[2] the Institute believed that neither it nor Fortuna would have to pay income tax on the earnings of the business. Thus the sellers would receive free of corporate taxation, and subject only to personal taxation at capital gains rates, 72% of the business earnings until they were paid $1,300,000. Without the sale they would receive only 48% of the business earnings, the rest going to the Government in corporate taxes, and this 48% would be subject to personal taxation at ordinary rates. In effect the Institute sold the respondents the use of its tax exemption, enabling the respondents to collect $1,300,000 from the business more quickly than they otherwise could and to pay taxes on this amount at capital gains rates. In return, the Institute received a nominal amount of the profits while the $1,300,000 was being paid, and it was to receive the whole business after this debt had been paid off. In any realistic sense the Government's grant of a tax exemption was used by the Institute as part of an arrangement that allowed it to buy a business that in fact cost it nothing. I cannot believe that Congress intended such a result.

The Court today legitimates this bootstrap transaction and permits respondents the tax advantage which the parties sought. The fact that respondent Brown, as a

---

[2] This lease arrangement was designed to permit the Institute to take advantage of its charitable exemption to avoid taxes on payment of Fortuna's profits to it, with Fortuna receiving a deduction for the rental payments as an ordinary and necessary business expense, thus avoiding taxes to both. Though unrelated business income is usually taxable when received by charities, an exception is made for income received from the lease of real and personal property of less than five years. See I. R. C. § 514; Lanning, Tax Erosion and the "Bootstrap Sale" of a Business–I, 108 Pa. L. Rev. 623, 684–689. Though denial of the charity's tax exemption on rent received from Fortuna would also remove the economic incentive underlying this bootstrap transaction, there is no indication in the Court's opinion that such income is not tax exempt. See the Court's opinion, *ante,* at 565–566.

result of the Court's holding, escapes payment of about $60,000 in taxes may not seem intrinsically important—although every failure to pay the proper amount of taxes under a progressive income tax system impairs the integrity of that system. But this case in fact has very broad implications. We are told by the parties and by interested *amici* that this is a test case. The outcome of this case will determine whether this bootstrap scheme for the conversion of ordinary income into capital gain, which has already been employed on a number of occasions, will become even more widespread.[3] It is quite clear that the Court's decision approving this tax device will give additional momentum to its speedy proliferation. In my view Congress did not sanction the use of this scheme under the present revenue laws to obtain the tax advantages which the Court authorizes. Moreover, I believe that the Court's holding not only deviates from the intent of Congress but also departs from this Court's prior decisions.

The purpose of the capital gains provisions of the Internal Revenue Code of 1954, § 1201 *et seq.,* is to prevent gains which accrue over a long period of time from being taxed in the year of their realization through a sale at high rates resulting from their inclusion in the higher tax brackets. *Burnet* v. *Harmel,* 287 U. S. 103, 106. These provisions are not designed, however, to allow capital gains treatment for the recurrent receipt of commercial or business income. In light of these purposes this Court has held that a "sale" for capital gains purposes is not produced by the mere transfer of legal title. *Burnet* v. *Harmel, supra; Palmer* v. *Bender,* 287 U. S. 551. Rather, at the very least, there must be a meaningful economic transfer in addition to a change in legal title. See *Corliss* v. *Bowers,* 281 U. S. 376. Thus the question posed here is not whether this transaction constitutes a sale within the

---

[3] See the articles cited in the majority opinion, *ante,* at 566, n. 2.

terms of the Uniform Commercial Code or the Uniform Sales Act—we may assume it does—but, rather, the question is whether, at the time legal title was transferred, there was also an economic transfer sufficient to convert ordinary income into capital gain by treating this transaction as a "sale" within the terms of I. R. C. § 1222 (3).

In dealing with what constitutes a sale for capital gains purposes, this Court has been careful to look through formal legal arrangements to the underlying economic realities. Income produced in the mineral extraction business, which "resemble[s] a manufacturing business carried on by the use of the soil," *Burnet* v. *Harmel, supra,* at 107, is taxed to the person who retains an economic interest in the oil. Thus, while an outright sale of mineral interests qualifies for capital gains treatment, a purported sale of mineral interests in exchange for a royalty from the minerals produced is treated only as a transfer with a retained economic interest, and the royalty payments are fully taxable as ordinary income. *Burnet* v. *Harmel, supra.* See *Palmer* v. *Bender, supra.*

In *Thomas* v. *Perkins,* 301 U. S. 655, an owner of oil interests transferred them in return for an "oil production payment," an amount which is payable only out of the proceeds of later commercial sales of the oil transferred. The Court held that this transfer, which constituted a sale under state law, did not constitute a sale for tax purposes because there was not a sufficient shift of economic risk. The transferor would be paid only if oil was later produced and sold; if it was not produced, he would not be paid. The risks run by the transferor of making or losing money from the oil were shifted so slightly by the transfer that no § 1222 (3) sale existed, notwithstanding the fact that the transaction conveyed title as a matter of state law, and once the payout was complete, full ownership of the minerals was to vest in the purchaser.

I believe that the sellers here retained an economic interest in the business fully as great as that retained by the seller of oil interests in *Thomas* v. *Perkins*. The sellers were to be paid only out of the proceeds of the business. If the business made money they would be paid; if it did not, they would not be paid. In the latter event, of course, they could recover the business, but a secured interest in a business which was losing money would be of dubious value. There was no other security. The Institute was not bound to pay any sum whatsoever. The Institute, in fact, promised only to channel to the sellers a portion of the income it received from Fortuna.

Moreover, in numerous cases this Court has refused to transfer the incidents of taxation along with a transfer of legal title when the transferor retains considerable control over the income-producing asset transferred. See, *e. g., Commissioner* v. *Sunnen,* 333 U. S. 591; *Helvering* v. *Clifford,* 309 U. S. 331; *Corliss* v. *Bowers, supra.* Control of the business did not, in fact, shift in the transaction here considered. Clay Brown, by the terms of the purchase agreement and the lease, was to manage Fortuna. Clay Brown was given power to hire and arrange for the terms of employment of all other employees of the corporation. The lease provided that "if for any reason Clay Brown is unable or unwilling to so act, the person or persons holding a majority interest in the principal note described in the Purchase Agreement shall have the right to approve his successor to act as general manager of Lessee company." Thus the shareholders of Clay Brown & Co. assured themselves of effective control over the management of Fortuna. Furthermore, Brown's attorneys were the named shareholders of Fortuna and its Board of Directors. The Institute had no control over the business.

I would conclude that on these facts there was not a sufficient shift of economic risk or control of the business

to warrant treating this transaction as a "sale" for tax purposes. Brown retained full control over the operations of the business; the risk of loss and the opportunity to profit from gain during the normal operation of the business shifted but slightly. If the operation lost money, Brown stood to lose; if it gained money Brown stood to gain, for he would be paid off faster. Moreover, the entire purchase price was to be paid out of the ordinary income of the corporation, which was to be received by Brown on a recurrent basis as he had received it during the period he owned the corporation. I do not believe that Congress intended this recurrent receipt of ordinary business income to be taxed at capital gains rates merely because the business was to be transferred to a tax-exempt entity at some future date. For this reason I would apply here the established rule that, despite formal legal arrangements, a sale does not take place until there has been a significant economic change such as a shift in risk or in control of the business.[4]

To hold as the Court does that this transaction constitutes a "sale" within the terms of I. R. C. § 1222 (3), thereby giving rise to capital gain for the income received, legitimates considerable tax evasion. Even if the Court restricts its holding, allowing only those transactions to be § 1222 (3) sales in which the price is not excessive, its decision allows considerable latitude for the unwarranted conversion of ordinary income into capital gain. Valuation of a closed corporation is notoriously difficult. The Tax Court in the present case did not determine that the price for which the corporation was sold represented its true value; it simply stated that the price "was the result

---

[4] The fact that respondents were to lose complete control of the business after the payments were complete was taken into account by the Commissioner, for he treated the business in respondents' hands as a wasting asset, see I. R. C. 1954, § 167, and allowed them to offset their basis in the stock against the payments received.

of real negotiating" and "within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of the corporate assets." 37 T. C., at 486. The Tax Court, however, also said that "[i]t may be . . . that petitioner [Clay Brown] would have been unable to sell the stock at as favorable a price to anyone other than a tax-exempt organization." 37 T. C., at 485. Indeed, this latter supposition is highly likely, for the Institute was selling its tax exemption, and this is not the sort of asset which is limited in quantity. Though the Institute might have negotiated in order to receive beneficial ownership of the corporation as soon as possible, the Institute, at no cost to itself, could increase the price to produce an offer too attractive for the seller to decline. Thus it is natural to anticipate sales such as this taking place at prices on the upper boundary of what courts will hold to be a reasonable price—at prices which will often be considerably greater than what the owners of a closed corporation could have received in a sale to buyers who were not selling their tax exemptions. Unless Congress repairs the damage done by the Court's holding, I should think that charities will soon own a considerable number of closed corporations, the owners of which will see no good reason to continue paying taxes at ordinary income rates. It should not be necessary, however, for Congress to address itself to this loophole, for I believe that under the present laws it is clear that Congress did not intend to accord capital gains treatment to the proceeds of the type of sale present here.

Although the Court implies that it will hold to be "sales" only those transactions in which the price is reasonable, I do not believe that the logic of the Court's opinion will justify so restricting its holding. If this transaction is a sale under the Internal Revenue Code, entitling its proceeds to capital gains treatment because it was arrived at after hard negotiating, title in a con-

veyancing sense passed, and the beneficial ownership was expected to pass at a later date, then the question recurs, which the Court does not answer, why a similar transaction would cease to be a sale if hard negotiating produced a purchase price much greater than actual value. The Court relies upon *Kolkey* v. *Commissioner,* 254 F. 2d 51 (C. A. 7th Cir.), as authority holding that a bootstrap transaction will be struck down where the price is excessive. In *Kolkey,* however, the price to be paid was so much greater than the worth of the corporation in terms of its anticipated income that it was highly unlikely that the price would in fact ever be paid; consequently it was improbable that the sellers' interest in the business would ever be extinguished. Therefore, in *Kolkey* the court, viewing the case as one involving "thin capitalization," treated the notes held by the sellers as equity in the new corporation and payments on them as dividends. Those who fashion "bootstrap" purchases have become considerably more sophisticated since *Kolkey;* vastly excessive prices are unlikely to be found and transactions are fashioned so that the "thin capitalization" argument is conceptually inapplicable. Thus I do not see what rationale the Court might use to strike down price transactions which, though excessive, do not reach *Kolkey's* dimensions, when it upholds the one here under consideration. Such transactions would have the same degree of risk-shifting, there would be no less a transfer of ownership, and consideration supplied by the buyer need be no less than here.

Further, a bootstrap tax avoidance scheme can easily be structured under which the holder of any income-earning asset "sells" his asset to a tax-exempt buyer for a promise to pay him the income produced for a period of years. The buyer in such a transaction would do nothing whatsoever; the seller would be delighted to lose his asset at the end of, say, 30 years in return for capital gains treat-

ment of all income earned during that period. It is difficult to see, on the Court's rationale, why such a scheme is not a sale. And, if I am wrong in my reading of the Court's opinion, and if the Court would strike down such a scheme on the ground that there is no economic shifting of risk or control, it is difficult to see why the Court upholds the sale presently before it in which control does not change and any shifting of risk is nominal.

I believe that the Court's overly conceptual approach has led to a holding which will produce serious erosion of our progressive taxing system, resulting in greater tax burdens upon all taxpayers. The tax avoidance routes opened by the Court's opinion will surely be used to advantage by the owners of closed corporations and other income-producing assets in order to evade ordinary income taxes and pay at capital gains rates, with a resultant large-scale ownership of private businesses by tax-exempt organizations.[5] While the Court justifies its result in the name of conceptual purity,[6] it simultaneously violates long-standing congressional tax policies that capital gains treatment is to be given to significant economic transfers of investment-type assets but not to ordinary commercial or business income and that transactions are to be judged on their entire substance rather than their naked form. Though turning tax consequences on form alone might produce greater certainty of the tax results of any transaction, this stability exacts as its price the certainty that tax evasion will be produced. In *Commissioner* v. *P. G.*

---

[5] Attorneys for *amici* have pointed out that tax-exempt charities which they represent have bought numerous closed corporations.

[6] It should be noted, however, that the Court's holding produces some rather unusual conceptual results. For example, after the payout is complete the Institute presumably would have a basis of $1,300,000 in a business that in reality cost it nothing. If anyone deserves such a basis, it is the Government, whose grant of tax exemption is being used by the Institute to acquire the business.

*Lake, Inc.*, 356 U. S. 260, 265, this Court recognized that the purpose of the capital gains provisions of the Internal Revenue Code is " 'to relieve the taxpayer from . . . excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' . . . And this exception has always been narrowly construed so as to protect the revenue against artful devices." I would hold in keeping with this purpose and in order to prevent serious erosion of the ordinary income tax provisions of the Code, that the bootstrap transaction revealed by the facts here considered is not a "sale" within the meaning of the capital gains provisions of the Code, but that it obviously is an "artful device," which this Court ought not to legitimate. The Court justifies the untoward result of this case as permitted tax avoidance; I believe it to be a plain and simple case of unwarranted tax evasion.