*Decision will be entered under Rule 155.*

VIRGIL L. AND MIRIAM M. POWELL, PETITIONERS
*v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 18679–90.          Filed February 2, 1993.

*Julian P. Kornfeld,* for petitioners.
*C. Glenn McLoughlin,* for respondent.

JACOBS, *Judge:* Respondent determined a deficiency of $786,599, and an addition to tax under section 6661 in the amount of $196,650, in petitioners' 1985 Federal income tax, based on the imposition of the golden parachute payments excise tax under section 4999. (Pursuant to section 4999(c)(2), the golden parachute payments excise tax is treated for tax assessment and collection purposes as an income tax.) Respondent now concedes the section 6661 addition to tax.

Section 4999 imposes a 20-percent excise tax on an "excess parachute payment" received by a corporate executive as the result of a change in ownership or control of his employer. Section 280G prohibits a corporate employer, or other payor, from deducting any amount that constitutes an excess parachute payment. Sections 4999 and 280G apply to contracts entered into or renewed after June 14, 1984, as well as contracts existing on June 14, 1984, which are thereafter amended in any significant relevant aspect. The deficiency involved herein is attributable to respondent's determination that Virgil L. Powell received excess parachute payments incident to the termination of his employment with Woods Petroleum Corp. (Woods) in 1985 totaling $4,237,500, consisting of: (1) A $3,475,000 employment severance payment and (2) $762,500 of a $1,525,000 stock option cancellation payment.

In determining whether the employment severance and stock option cancellation payments constitute excess parachute payments, we must decide: (1) Whether section 4999 applies to the pre-June 14, 1984, employment agreement between Virgil L. Powell and Woods and (2) whether $762,500 of a $1,525,000 stock option cancellation payment constitutes a "parachute payment" within the meaning of section 280G(b)(2)(A). In both instances, we hold in favor of petitioners.

Unless otherwise stated, all section references are to the Internal Revenue Code in effect for the year in issue.

### FINDINGS OF FACT

We incorporate the stipulation of facts and attached exhibits.

Virgil L. Powell and his wife, Miriam M. Powell, resided in Oklahoma City, Oklahoma. Hereinafter, Virgil L. Powell is referred to singularly as petitioner.

Petitioner began his career at Woods in 1966 as its vice president and assistant general manager of exploration and production. (Woods' business was exploring for and producing oil and natural gas.) In 1971, he was promoted to executive vice president, and in 1973 to Woods' chief operating officer. In 1984, he became Woods' president and chief executive offi-

cer. His employment with Woods was terminated on May 30, 1985.

Prior to 1982, petitioner had no written employment agreement with Woods. On August 17, 1982, petitioner entered into a written employment agreement with Woods. The agreement provided that petitioner's term of employment with Woods would run until December 31, 1987, unless sooner terminated as a result of petitioner's death or permanent disability, or on the 30th day following written notice of termination from either party. In the event Woods terminated petitioner's employment, Woods was obligated to continue to pay petitioner his base salary (which for 1982 was approximately $172,000) with appropriate cost of living adjustments, plus all perquisites and benefits which petitioner had been receiving, until December 31, 1987. In the event petitioner terminated his employment, Woods was not required to pay petitioner any further salary or benefits.

In 1982, as part of petitioner's compensation package, Woods and petitioner also executed two stock option agreements.

On November 15, 1983, two amendment agreements to petitioner's August 17, 1982, employment agreement with Woods were executed. These amendment agreements, in part, were in response to various expressions of interest in acquiring Woods or control thereof. (The employment agreement and its two amendments are herein referred to singularly as petitioner's employment agreement.)

To encourage petitioner's continued employment with Woods until December 31, 1988, the employment agreement provided that if petitioner's employment with Woods was terminated by virtue of a change in control (a change in control was defined to include a situation where any person or entity acquired 30 percent or more of the voting securities of Woods):

(1) Petitioner would receive an employment severance payment in an amount equal to the product obtained by multiplying the amount of his annual salary by the number of years remaining from the date of termination of petitioner's employment with Woods until December 31, 1988, or by 5 years, whichever was greater (the severance period), plus a lump-sum amount equal to the retirement benefits he would have received under the Woods pension plan had he contin-

ued to be a participant in such plan over the severance period;

(2) petitioner would be entitled to receive the continuation of various company-paid benefits and reimbursement of his travel and entertainment expenses through the end of the severance period; and

(3) Woods would redeem all unexercised stock options held by petitioner and pay him as a stock option cancellation payment an amount equal to the product obtained by multiplying (i) the number of shares subject to the unexercised stock options by (ii) the amount by which the stock purchase price paid by the party acquiring control of Woods exceeded the option exercise price.

On November 13, 1984, Woods' board of directors adopted a supplemental pension plan covering certain executives of Woods, including petitioner. The supplemental pension plan (which was not qualified under section 401(a)) was adopted after the Internal Revenue Code was changed to limit the maximum retirement benefits payable under qualified pension plans.[1] The purpose of the supplemental pension plan was to keep whole those Woods employees who, absent a change in the law, would otherwise have been entitled (under the existing Woods qualified plan) to an annual pension benefit in excess of $90,000.

In February 1985, Sunshine Mining Co. (Sunshine) entered into agreements to buy approximately 25 percent of Woods' stock for $25 per share; such stock was acquired by April 19, 1985. By March 6, 1985, Sunshine had purchased an additional 5.5 percent of Woods' stock on the open market for $25 per share. Thus, as of April 19, 1985, Sunshine had acquired over 30 percent of the voting stock of Woods.

On March 6, 1985, Woods and Sunshine entered into a merger agreement pursuant to which Woods became a wholly owned subsidiary of Sunshine. During the merger negotiations, petitioner was informed that his employment with Woods would be terminated.

On May 30, 1985, petitioner resigned as an officer, a director, and an employee of Woods. At that time, petitioner's

---

[1] Sec. 415(b)(1)(A) limits the annual retirement benefit for a defined benefit plan to the lesser of $90,000 or 100 percent of the participant's average compensation for his high 3 years.

base amount, within the meaning of section 280G, was $309,949.

A dispute arose concerning the amounts payable to petitioner under his employment agreement with Woods. Eventually, the parties settled their dispute by an agreement dated May 30, 1985. As part of their settlement agreement, Woods paid petitioner $3,475,000 for the cancellation of his employment agreement. Woods also paid petitioner $1,525,000, which was twice the amount petitioner would have received if his stock options had been redeemed pursuant to the employment agreement.

Respondent determined that petitioner received parachute payments, within the meaning of section 280G(b)(2), totaling $4,237,500 which were subject to taxation under section 4999(a). This amount consists of the $3,475,000 employment severance payment and $762,500 of the $1,525,000 stock option cancellation payment.

### OPINION

Section 4999(a) imposes a 20-percent excise tax on excess parachute payments.[2] Under section 280G(b)(2), a parachute payment is a payment in the nature of compensation to a disqualified individual,[3] if the payment is contingent on a change in the ownership or control of the corporation and the present value of the payment equals or exceeds three times the individual's base amount.[4] We address the application of

---

[2] Sec. 280G(b) defines an excess parachute payment as follows:

SEC. 280G(b). EXCESS PARACHUTE PAYMENT.—For purposes of this section—

(1) IN GENERAL.—The term "excess parachute payment" means an amount equal to the excess of any parachute payment over the portion of the base amount allocated to such payment.

(2) PARACHUTE PAYMENT DEFINED.—

(A) IN GENERAL.—The term "parachute payment" means any payment in the nature of compensation to (or for the benefit of) a disqualified individual if—

(i) such payment is contingent on a change—

(I) in the ownership or effective control of the corporation, or

(II) in the ownership of a substantial portion of the assets of the corporation, and

(ii) the aggregate present value of the payments in the nature of compensation to (or for the benefit of) such individual which are contingent on such change equals or exceeds an amount equal to 3 times the base amount.

[3] Sec. 280G(c) defines disqualified individuals as follows:

SEC. 280G(c). DISQUALIFIED INDIVIDUALS.—For purposes of this section, the term "disqualified individual" means any individual who is—

(1) an employee, independent contractor, or other person specified in regulations by the Secretary who performs personal services for any corporation, and

(2) is an officer, shareholder, or highly-compensated individual.

[4] Sec. 280G defines base amount as follows:

sections 280G and 4999 first to petitioner's receipt of the $3,475,000 employment severance payment and then to his receipt of the $1,525,000 stock option cancellation payment.

*Issue 1. Was Petitioner's Employment Agreement Entered Into, Renewed, or Amended After June 14, 1984, the Effective Date of Sections 280G and 4999?*

The Deficit Reduction Act of 1984, Pub. L. 98-369, section 67(e), 98 Stat. 587, provides that sections 280G and 4999 should apply only to payments under agreements entered into, renewed, or amended in any significant relevant aspect after June 14, 1984, the effective date of sections 280G and 4999:

(e) Effective Dates.—

(1) In General.—The amendments made by this section shall apply to payments under agreements entered into or renewed after June 14, 1984, in taxable years ending after such date.

(2) Special Rule For Contract Amendments.—Any contract entered into before June 15, 1984, which is amended after June 14, 1984, in any significant relevant aspect shall be treated as a contract entered into after June 14, 1984.

Respondent contends that we should treat petitioner's employment agreement as a new contract entered into or renewed after June 14, 1984, because such agreement was cancelable at will by either Woods or petitioner. Respondent relies on the conference report on the Deficit Reduction Act of 1984 to support this argument. The conference report states that, for the purposes of sections 280G and 4999, an agreement cancelable at will by either party is to be treated

---

SEC. 280G(b). EXCESS PARACHUTE PAYMENT.—For purposes of this section—

     *      *      *      *      *      *      *

(3) BASE AMOUNT.—

(A) IN GENERAL.—The term "base amount" means the individual's annualized includible compensation for the base period.

(B) ALLOCATION.—The portion of the base amount allocated to any parachute payment shall be an amount which bears the same ratio to the base amount as—

(i) the present value of such payment, bears to

(ii) the aggregate present value of all such payments.

     *      *      *      *      *      *      *

(d) OTHER DEFINITIONS AND SPECIAL RULES.—For purposes of this section—

     *      *      *      *      *      *      *

(2) BASE PERIOD.—The term "base period" means the period consisting of the most recent 5 taxable years ending before the date on which the change in ownership or control described in paragraph (2)(A) of subsection (b) occurs (or such portion of such period during which the disqualified individual was an employee of the corporation).

as a new contract entered into on the date any such cancellation is effective:

*Effective date*

The conference agreement is effective for payments made under contracts entered into or renewed after June 14, 1984. For this purpose, *a contract cancellable at will by either party is to be treated as a new contract entered into on the date any such cancellation, if made, would be effective.* Payments under agreements in effect on June 14, 1984, are not affected by the provision unless the terms of such agreements are amended in significant relevant respect after that date. The conferees intend that an agreement will be treated as so amended if it is amended (or supplemented) either to add or modify a change in ownership or control trigger (or similar trigger), to increase amounts payable (or, where payment is under a formula, to modify the formula) in the event of such a trigger, or to accelerate the payment of amounts otherwise payable at a later date in the event of such a trigger. Where a golden parachute agreement in effect on June 14, 1984, is so amended or supplemented after that date, all amounts payable under the contract (and any supplement) are subject to the provision. [H. Conf. Rept. 98-861 (1984), 1984-3 C.B. (Vol. 2) 1, 107-108; emphasis added.]

See sec. 1.280G-1, Q&A-48(a), Proposed Income Tax Regs., 54 Fed. Reg. 19408 (May 5, 1989).

Petitioner posits that his employment agreement was not cancelable at will within the meaning of the conference report. Alternatively, he argues that the Court should not look to the conference report because: (1) Section 67(e) of the Deficit Reduction Act of 1984 is unambiguous; and (2) the legislative history concerning sections 280G and 4999 is ambiguous. Because we conclude that petitioner's employment agreement was not cancelable at will, we do not address petitioner's alternative arguments.

The conference report did not include a definition of the term "cancelable at will". Therefore, we refer to the ordinary definition of the term. *Commissioner v. Brown,* 380 U.S. 563, 570-571 (1965).

The definition in Oklahoma, which is reflective of the ordinary definition of the term, is that "The at-will employment doctrine is an American common-law rule under which either the employer or employee can cancel the relationship without liability when the length of the master/servant bond is unspecified by contract." *Tate v. Browning-Ferris, Inc.,* 833 P.2d 1218, 1224 n.23 (Okla. 1992).

We extract from the Oklahoma Supreme Court's definition two factors indicating when an employment agreement is cancelable at will: (1) The term of employment is not specified in the employment agreement; and (2) the employment agreement can be canceled without any liability.

Applying these two factors to petitioner's employment agreement, we conclude that petitioner's employment agreement is not cancelable at will. First, the term of petitioner's employment agreement was approximately 5½ years: petitioner's employment agreement provided that the agreement would commence on August 17, 1982, and would terminate on December 31, 1987 (extended on November 15, 1983, to December 31, 1988), unless canceled earlier. Second, petitioner's employment agreement could not be canceled without liability: if Woods canceled the agreement, then Woods would be obligated to continue to pay petitioner his salary with appropriate cost of living adjustments, plus all perquisites and benefits until December 31, 1988.

Our conclusion is consistent with the General Explanation of the Deficit Reduction Act of 1984 and by respondent's proposed regulations. The General Explanation states:

> The provisions [of sections 280G and 4999] are effective for payments made under contracts entered into or renewed after June 14, 1984. * * * A contract cancellable *unconditionally* at will by either party to it, the disqualified individual or the company, is to be treated as a new contract entered into on the date any such cancellation, if made, would be effective. Thus, for example, if an employer can, at will, cancel a golden parachute contract entered into before June 15, 1984, by giving 3-months notice, the contract is to be treated as a new contract on September 15, 1984, whether or not it is in fact cancelled. *The Congress did not intend that a parachute contract be treated as cancellable at will for this purpose if it could be cancelled only by terminating the employment relationship or similar relationship of the individual involved as well. In such a case, cancellation would produce a significant change in the relationship of the parties to each other* in addition to merely terminating a parachute arrangement. [Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 206 (J. Comm. Print 1984); emphasis added.]

Respondent's proposed regulations provide:

> Q-48: How is a contract that is cancellable at will treated for purposes of the effective date of section 280G and this section?
>
> A-48: (a) For this purpose, a contract that is terminable or cancellable *unconditionally* at will by either party to the contract without the consent

of the other, or by both parties to the contract, is treated as a new contract entered into on the date any such termination or cancellation, if made, would be effective. *However, a contract is not treated as so terminable or cancellable if it can be terminated or cancelled only by terminating the employment relationship or independent contractor relationship of the disqualified individual.*

[Sec. 1.280G-1, Q&A-48(a), Proposed Income Tax Regs., 54 Fed. Reg. 19408 (May 5, 1989); emphasis added.]

We extract from the General Explanation and respondent's proposed regulations two additional factors indicating when a contract is cancelable at will: (1) The contract can be canceled unconditionally; and (2) the contract can be canceled without also terminating the employment relationship, which means without significantly changing the relationship of the parties to the employment agreement.[5]

Applying the first additional factor, we conclude that Woods' right to cancel petitioner's employment agreement was conditioned on Woods' payment to petitioner of amounts reflecting the total compensation that would have been due him for the remaining term of the agreement. Thus, petitioner's employment agreement was not cancelable "unconditionally" within the meaning of the General Explanation and the proposed regulations. Applying the second additional factor, we conclude that had Woods canceled petitioner's employment agreement, petitioner's relationship with Woods pursuant thereto would have been significantly changed: Petitioner would cease to be president of Woods; he would resign from the board of directors if requested; he would not be active in day-to-day operations of Woods; and he would be free to arrange the time and manner of performance of his services as an employee of Woods. Thus, petitioner's employment agreement could not be canceled without also "terminating his employment relationship", within the meaning of the General Explanation and the proposed regulations.

Respondent argues that an employment agreement is cancelable at will if the employer can cancel it without the

---

[5] The focus in the conference report is on whether the disqualified individual's *parachute contract* is cancelable at will. H. Conf. Rept. 98-861 (1984), 1984-3 C.B. (Vol. 2) 1, 107-108; see Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 206 (J. Comm. Print 1984). In the instant case, there was no separate parachute contract. Rather, there was a golden parachute provision in petitioner's employment agreement. Thus, the proper focus is on whether the golden parachute provision in petitioner's employment agreement could be canceled without terminating petitioner's employment relationship with Woods.

employee's consent. We believe this argument is too simplistic. While we recognize one party to an agreement can always repudiate the agreement, we must also take into account the extent to which the canceling party will be liable to the other party as a result of the cancellation.

The Deficit Reduction Act of 1984 provided that sections 280G and 4999 applied not only to employment agreements entered into or renewed after June 14, 1984, but also to employment agreements amended in any significant relevant aspect after that date. Respondent asserts that petitioner's employment agreement was amended in a significant relevant aspect after June 14, 1984. In particular, respondent argues that Woods' board of directors amended a significant relevant aspect of petitioner's employment agreement by adopting the supplemental pension plan in November 1984. Respondent calculates that the adoption of the supplemental pension plan increased petitioner's pension benefits in the event of a change in the control of Woods by a minimum of $171,063. Respondent asserts that under the supplemental pension plan, petitioner was entitled to receive pension benefits in the amount of $1,477,464, based on his continued participation in the pension plan through the severance period from May 1985, when petitioner's employment agreement was canceled, through May 1990. In contrast, respondent asserts that under petitioner's employment agreement, petitioner was entitled to receive benefits in the amount of $1,306,401, based on his continued participation in the pension plan only through the approximately 3½-year period from May 1985 through December 1988, when petitioner's employment agreement would have otherwise terminated. Respondent calculates that the additional pension benefits provided by the supplemental pension plan equaled $171,063, the difference between $1,477,464 and $1,306,401.

Petitioner's settlement agreement with Woods did not break down the $3,475,000 employment severance payment. However, we will assume arguendo that some of the $3,475,000 payment was attributable to the cancellation of petitioner's rights under the supplemental pension plan.

We agree with respondent that one circumstance in which an employment agreement is considered to be amended in a significant relevant aspect is when there is an increase in the payments that is contingent upon a change in ownership or

control. Sec. 1.280G-1, Q&A-50(b), Proposed Income Tax Regs., 54 Fed. Reg. 19408 (May 5, 1989). However, we disagree with respondent's assertion that petitioner's employment agreement provided $1,306,401 in pension benefits based on petitioner's continued participation in the pension plan for only the approximately 3½-year period. Petitioner's employment agreement provided that, upon a change in the control of Woods, petitioner was entitled to continue to participate in the pension plan through the severance period. We conclude that, in adopting the supplemental pension plan, Woods' board of directors did not increase the amount of petitioner's pension benefits and thus did not amend a significant relevant aspect of petitioner's employment agreement.

Respondent insists that the purpose of the supplemental pension plan was to permit petitioner to continue to participate in the pension plan through the severance period. Respondent argues that if petitioner's employment agreement already provided that petitioner was entitled to continue to participate in the pension plan through the severance period, then there was no need for Woods' board of directors to have adopted the supplemental pension plan.

In refuting respondent's argument, we first note that there is no copy of the supplemental pension plan in the record. According to the minutes of a meeting of Woods' board of directors, to the parties' stipulations, and to petitioner's trial testimony (which we found truthful), the purpose of the supplemental pension plan was to protect certain executives who would lose those pension benefits in excess of the $90,000 annual limits imposed by section 415(b)(1)(A). However, petitioner did not need this protection. Petitioner's employment agreement provided that if Woods amended the pension plan, then petitioner would receive no lesser benefits than he would have received under the pension plan existing at the commencement date of the employment agreement. Thus, insofar as petitioner was concerned, the supplemental pension plan, rather than increasing his pension benefits, simply served to implement a preexisting contractual guarantee that the level of his annual pension benefits would not be diminished.

We conclude that Woods' $3,475,000 payment to petitioner to cancel his employment agreement was not a payment

under an agreement entered into, renewed, or amended in any significant relevant aspect after June 14, 1984.[6] Thus, we hold that Woods' $3,475,000 payment to petitioner was not subject to tax under section 4999.[7]

*Issue 2. Was One-Half of the Stock Option Cancellation Payment a Parachute Payment?*

Section 280G(b)(2)(A)(ii) defines a parachute payment to require that the present value of the payment equal or exceed three times the disqualified individual's base amount. Petitioner's base amount was $309,949. Three times petitioner's base amount equals $929,847. We conclude that the $762,500 payment, one-half of the stock option cancellation payment, was not a parachute payment because $762,500 does not equal or exceed $929,847.[8] Thus, we hold that the $762,500 payment was not subject to tax under section 4999.

*Decision will be entered for petitioners.*

---

[6]Respondent does not argue, and we do not address the argument, that petitioner's employment agreement was amended in a significant relevant aspect after June 14, 1984, as a result of the settlement agreement, pursuant to which Woods agreed to pay petitioner $1,525,000 to cancel all of his stock options.

[7]Because we conclude that petitioner's employment agreement was not entered into, renewed, or amended in any significant relevant aspect after June 14, 1984, we do not address petitioner's other arguments: (1) Whether the parachute payment constituted "reasonable compensation" for petitioner's services to be rendered on or after the change in ownership or control, within the meaning of sec. 280G(b)(4)(A); or (2) whether $2,670,613 of the amount respondent alleged as a parachute payment constituted a payment "contingent on a change" in ownership or control, within the meaning of sec. 280G(b)(2)(A)(i). See sec. 1.280G-1, Q&A-24(c), Proposed Income Tax Regs., 54 Fed. Reg. 19399 (May 5, 1989).

[8]Petitioner argues that the $762,500 payment was not a parachute payment because it was not a payment in the nature of compensation, within the meaning of sec. 280G(b)(2)(A). We do not address this argument because we conclude that the $762,500 payment did not equal or exceed an amount equal to 3 times the base amount within the meaning of sec. 280G(b)(2)(A)(ii).